In the Matter of the Requested Extradition of Kevin Barry John ARTT.

In the Matter of the Requested Extradition of Pol BRENNAN.

In the Matter of the Requested Extradition of Terence Damien KIRBY.

Nos. CR–92–0151–MISC–CAL, CR–93–0032–MISC–CAL and CR–94–0086–MISC–CAL.

United States District Court, N.D. California.

Aug. 11, 1997.

United States Dept. of Justice, Office of U.S. Attorney, Mark Zandies, Assistant U.S. Attorney, Oakland, CA, for U.S.

William M. Goodman, Topel & Goodman, David Rossiter Callay, Topel & Goodman, San Francisco, CA, Jennifer H. Small, James J. Brosnahan, Morrison & Foerster LLP, San Francisco, CA, for Kevin John Artt.

Harold Rosenthal, Dennis P. Riordan, Riordan & Rosenthal, San Francisco, CA, James Larson, San Francisco, CA, for Paul Brennan.

Thomas Eastridge, Gilbert Eisenberg, San Francisco, CA, for Damien Kirby.

## OPINION AND ORDER FOR EXTRADITION

LEGGE, District Judge.

| | Page |
|---|---|
| OVERVIEW | 1256 |
| HISTORICAL CONTEXT | 1257 |
| INTERPRETATION OF THE SUPPLEMENTARY TREATY | 1259 |
| THIS COURT'S DEFINITION OF THE TRIABLE ISSUES | 1260 |
| APPLICATION OF THE MAIN TREATY TO RESPONDENT BRENNAN | 1260 |
| THE TWO DEFENSES UNDER ARTICLE 3(a) | 1262 |
| ALLEGED TRUMPED UP CHARGES | 1262 |
| 1. The Voluntariness of Respondents' Confessions | 1263 |
| 2. The Convictions of Respondent Kirby | 1263 |
| 3. The Conviction of Respondent Artt | 1265 |

| | | Page |
|---|---|---|
| (a) | The hearing on Artt's confession | 1265 |
| (b) | Claim of innocence | 1266 |
| (c) | Trial | 1266 |
| (d) | Pre-arrest events | 1266 |
| THE SPECIAL DEFENSE OF RESPONDENT BRENNAN | | 1268 |
| FUTURE TREATMENT OF RESPONDENTS IN NORTHERN IRELAND | | 1269 |
| 1. | Maze Prison | 1270 |
| 2. | Conditions After Respondents' Release From Prison | 1272 |
| (a) | Alleged collusion | 1272 |
| (b) | Belfast generally | 1273 |
| CONCLUSIONS | | 1274 |

## OVERVIEW

The United Kingdom seeks the extradition of respondents Kevin Artt, Pol Brennan, and Terence Kirby. The respondents were separately convicted in courts of the United Kingdom in Northern Ireland for offenses of violence. They were then confined in the Maze Prison in Belfast, Northern Ireland. They escaped from the Maze Prison and managed to come to the United States. They lived in the United States under assumed names for several years, until their apprehension by United States law enforcement agencies.

The United Kingdom seeks the extradition of respondents under the treaties between the United States and the United Kingdom, specifically the Supplementary Treaty of 1985.[1]

This court held on September 25, 1996 that the United Kingdom had established the prerequisites to the jurisdiction of this court and to the extradition of respondents, under Article 2 of the Supplementary Treaty. The United Kingdom established that there is probable cause for their extradition; that is, respondents are the persons sought by the United Kingdom, and they were convicted of crimes in the United Kingdom. Appropriate certificates of respondents' convictions in Northern Ireland, and judicial records in support of the certificates, were filed with this court. The convictions upon which the requests for respondents' extradition are based would constitute offenses punishable under the laws of the United States.

Respondents oppose extradition by invoking their rights under Article 3(a) of the Supplementary Treaty:

[E]xtradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try to punish him *on account of his race, religion, nationality, or political opinions*, or that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty *by reason of his race, religion, nationality, or political opinions*.

(Emphasis added.)

This court has jurisdiction under Articles 2 and 3 of the Supplementary Treaty, and under 18 U.S.C. Section 3184.

Numerous pre-trial motions were made, heard, and resolved by this court. The court allowed respondents to have discovery, including discovery of witnesses and records in Northern Ireland. The court then conducted a trial on the defenses raised by respondents. The trial was before this court sitting without a jury. The court heard the testimony of the witnesses, including live testimony, written depositions, and video depositions, and reviewed voluminous exhibits received into evidence.[2] The court also received briefs from the parties and heard arguments of law and fact. The issues have been submitted to the court for decision.

In summary, the court concludes that: (1) Respondents were each convicted of crimes

---

**1.** The Supplementary Treaty concerning the Extradition Treaty Between the Government of the United States of America and the Government of The United Kingdom of Great Britain and Northern Ireland signed at London on 8 June 1972; dated June 25, 1985.

**2.** The court has ruled on the admissibility of all contested exhibits by making its rulings on the parties' multiple and over-lapping exhibit lists, which lists are now filed with the Clerk of the court.

of violence in Northern Ireland, based upon substantial evidence and with appropriate judicial procedures. (2) Respondents were not convicted, and will not be punished, detained or restricted in their personal liberty, because of their race, religion, nationality, or political opinions. (3) Rather, their convictions and punishments are because of the crimes of violence which they committed. (4) Certificates of their extraditability will therefor be issued by this court under the provisions of the Supplementary Treaty and 18 U.S.C. Section 3184. The court's reasons are set forth in this opinion.

## HISTORICAL CONTEXT

The historical context in which these cases arose in Northern Ireland is a tragedy—of history, of politics and of religion. The tragic consequences of that history are apparent in our daily newspapers, and are apparent in the evidence presented in these cases. This court has no power to change that history. And it would be presumptuous of this judicial officer to criticize the history of another country. This court must therefore limit itself to proper decisions of law and fact on the issues presented to its jurisdiction, rather than pass judgments on the forces of history. But some discussion of the present context of Northern Ireland, at least for the last twenty years—the time frame in which the events in these cases occurred—is necessary to the court's decision:

Although there are people of reason and good faith on both sides, the present circumstances are driven by the extremists on each side. On one side is the Catholic–Nationalist–Republican community. Very broadly speaking, that community seeks to have Northern Ireland become a part of the Republic of Ireland, and seeks to have the United Kingdom withdraw. Some condone violence to that and, including murder and destruction of property. This is the announced objective of the Irish Republican Army (IRA). On the other side is the Protestant–Loyalist community. Again very broadly speaking, that community resists the unification of Northern Ireland with the Republic of Ireland, and to a greater or lesser degree wishes the United Kingdom to maintain a presence. There are also members of that community who condone murder and destruction of property in support of their aims, identified generally as "loyalist paramilitary groups."

Those are of course the extremists. The vast majority of the residents of Northern Ireland, members of both religious and political communities, undoubtedly wish to pursue their lives in peace, to participate in the growing economic prosperity of Ireland, and to use only lawful and democratic means to achieve change. But the extremes have set the agenda.

These divisions have been particularly acute in Belfast. The city map is a patchwork of Catholic areas, Protestant areas, and a few mixed or neutral areas.

In between the extremist factions is the Royal Ulster Constabulary (RUC), the police force in Northern Ireland. It is charged, as is any police force, with keeping law and order. But its problems in performing that charge have been greatly multiplied by the violence between the extreme factions. The RUC has also had problems of its own. In part because its membership is predominantly Protestant, it has been viewed by some of the Catholic community as being a force for oppression rather than a force for the keeping of peace. And its officers have been subjected to direct and violent attacks by the extremists on both sides.

By 1969 the warring factions could not be controlled by the RUC, either because of the limited size and resources of that force, or because of the magnitude of the violence. The British Army was then brought into Northern Ireland to assist in keeping peace. Indeed, the army was at first viewed as a peace-keeper. But over time, the Catholic community began to view the British Army as another tool of repression. The violence continued—indeed, escalated—and was directed against the army also. At times the violence bordered on outright civil war, with the Catholic–Republican–Nationalists and the Protestant–Loyalists extremes on each side, and the army and the RUC somewhere in the middle—but viewed by both sides with

suspicion. The circumstances lead to daily fear and suffering. The court heard extensive testimony about routine stops of cars and persons, beatings, incarcerations, and invasions of homes for searches, with no protections akin to the Fourth Amendment of our constitution. But the results of that suffering were by no means one-sided. For each story of tragedy to a Catholic–Republican–Nationalist family there is a story of tragedy to a Protestant–Loyalist family. And the innocent majority of peaceful Belfast residents have also suffered death and destruction.

What is the role of the criminal justice system in all of that? During the heights of the violence, suspected persons were simply interned by the army and kept in camps similar to prisoner of war camps. The potentials for injustice in that internment system were obvious, where persons were kept for indefinite periods of time without evidence of the actual commission of crimes and without charges being brought against them.

The anti-terrorism statutes passed by Parliament and the so-called Diplock courts were in response to those conditions and to that injustice. They were an attempt to protect the general population, to provide some civil rights to the accuseds, and at the same time to try and punish the terrorists on both sides. The system does not have all of the individual protections which we are used to under the American system of criminal justice. But it is a genuine attempt to deal with a virtually war-like setting, to protect the general population, and to provide some measure of civil liberties to the accuseds. The court notes that even President Abraham Lincoln suspended habeas corpus during the American civil War. *See Bridges v. United States,* 184 F.2d 881, 886–87 (9th Cir.1950); *Gun South, Inc. v. Brady,* 711 F.Supp. 1054, 1061 (N.D.Ala.1989).

Because the Diplock trial procedures are an expedited system, without the full spectrum of civil rights protections, they have obviously been viewed with suspicion by those caught up in the processes. But it is apparent from the evidence that the justice system has attempted to function even-handedly. It has administered the same laws and procedures to the Catholic–Republican–Nationalist extremists and to the Protestant–Loyalist extremists. Prisons in Northern Ireland are filled with both.

That is the context in which these respondents were convicted, and from which these extradition proceedings arise. As stated, this court cannot change history and cannot solve the underlying problems of Northern Ireland. But giving convicted terrorists, either Catholic–Republican–Nationalists or Protestant–Loyalists, a safe haven in the United States will not solve the problems either. So this court must focus on these respondents and on *this* treaty, and it must weigh the evidence and apply the law—performing the historical functions of the judicial branch of government.

In that regard, Northern Ireland's history has had another perverse effect on the administration of justice. That is, terrorists attempt to justify their conduct and escape its consequences, merely because they committed the violence in the name of a cause they believe to be right. But terrorists should not be sheltered from the criminal consequences of their acts just because their acts were committed in the name of a political or religious cause. Because a terrorist commits a crime of violence in support of a cause does not mean that the terrorist, when caught and convicted, is being punished because of that cause. Terrorists must accept the consequences of their *criminal* acts, regardless of the name in which they were performed. Indeed, that was one of the reasons for the enactment and passage of the Supplementary Treaty.

■ While Article 3(a) of the Supplementary Treaty shelters respondents from prosecution because of their religious and political beliefs, it does not shelter them from prosecution for their criminal conduct just because they have those beliefs. That distinction was noted by the Ninth Circuit in *In re Requested Extradition of Smyth,* 61 F.3d 711, 720 (9th Cir.1995) at 720–21. That is, in order to avoid extradition under the treaty, respondents must show that their punishment is because of their race, religion, nationality, or

politics, and not because of their criminal acts. That distinction has its genesis in Article 3(a) itself, which contains the causation requirements of "on account of" and "by reason of" those protected factors.

### INTERPRETATION OF THE SUPPLEMENTARY TREATY

The Supplementary Treaty and extradition proceedings under it were interpreted by the United States Court of Appeals for the Ninth Circuit in *In re Smyth, Id.* Respondent Smyth was convicted in Northern Ireland, was a prisoner in the Maze Prison, and escaped at the same time as the three respondents now before this court. The *Smyth* court made holdings and statements about the treaty and proceedings under it which are important in the present case.

First, conditions in Northern Ireland, however chaotic, do not preclude extradition. Article 3(a) does not prevent extradition because of general political or violent conditions in Northern Ireland; rather, the inquiries must be individualized to these respondents. And any alleged adverse consequences to them upon their return to Northern Ireland must be acts of the criminal justice system and not of society generally. *Id.* at 715.

... Article 3(a) must mean that a federal court in an extradition proceeding may look to the treatment that likely will be accorded the extraditee upon the charge for which extradition is sought. This inquiry need not necessarily be limited to the prosecution and formal term of imprisonment, but *Article 3(a) does not permit denial of extradition on the basis of an inquiry into the general political conditions extant in Northern Ireland.* The history of the provision shows that it requires an individualized inquiry.

Accordingly, in order to defeat extradition on the basis of his prospective treatment at the hands of the justice system extending beyond the duration of his formal imprisonment term, [respondent] would have to demonstrate by a preponderance of the evidence that *the criminal justice system in Northern Ireland likely would exact additional retribution for his crime beyond the remaining term of imprisonment, and that such additional punishment would be inflicted on account of [respondent's] political or religious beliefs, and not on account of his having [committed a crime].*

*Id.* at 720 (emphasis added).

Second, the *Smyth* opinion discussed the history and the objectives of the Supplementary Treaty. That discussion need not be repeated in detail here, but rather the reader is referred to *Smyth, Id.* at 713–16. The opinion expressly states that the Article 3(a) defense is not a mere restatement of the prior "political" defense to extradition. Rather, it is a new inquiry. The Article 3(a) defense focuses on the treatment which the respondents will likely receive at the hands of the United Kingdom's criminal justice system. *Id.* at 715.

Third, the court affirmed the language of Article 3(a) that the burden of proof is on each respondent to establish, by a preponderance of the evidence, that the defense of Article 3(a) applies to him. *Id.* at 715–16.

Fourth, the court drew the following distinction which is important to the application of Article 3(a) here:

Article 3(a) requires that the person sought establish by a "preponderance of the evidence" one of two situations. Under the first clause of the defense, the extraditee may show that the request for extradition has in fact been made with the purpose of trying or punishing him *on account of racial, religious or political factors....* In the alternative, he must establish that if surrendered, he will be prejudiced at his trial, or "punished, detained or restricted in his personal liberty *by reason of his race, religion, nationality, or political opinions."* Supplementary Treaty, art. 3(a).

Article 3(a) .... does *not* authorize denial of extradition *on account of the punishment, official or unofficial, that will be imposed for the underlying criminal act* ....

*Id.* at 721 (emphasis added). *See* also *Id.* at 713, 720.

The inquiry under the treaty must therefore distinguish between punishment for religious and political reasons, which would bar extradition, and punishment for a criminal act, which would not bar extradition.

## THIS COURT'S DEFINITION OF THE TRIABLE ISSUES

Building upon the *Smyth* opinion, this court defined before trial the scope of the extradition trial of these respondents; order March 20, 1996. That definition guided the pretrial discovery, the motions, and the trial itself, and is applied in this decision:

■ (1) Each of the three respondents bears the burden of establishing, by a preponderance of the evidence, the necessary elements of Article 3(a) as to himself.

(2) Each respondent must establish that adverse action, as defined in Article 3(a) and below, was, is or will be taken against him because of his "race, religion, nationality, or political opinions." (In order to avoid the unnecessary repetition of that phrase, this court simply refers to those elements, collectively and severally, as "the protected factors.") That is, each respondent must establish that any adverse action is *because of* the defined protected factors.

(3) This trial included inquiry into whether the respondents were convicted in Northern Ireland because of the protected factors. That is not a generalized inquiry into the Diplock court system, but of the facts of each respondent's conviction.

■ (4) This trial included evidence of the conditions of respondents' confinement in the Maze Prison before they escaped, and the conditions of confinement which they might expect if they are returned. The issue of the conditions of future confinement must concern conditions imposed upon them because of the protected factors, and not because of their crimes.

■ (5) This trial included evidence of pre-arrest treatment. But that evidence is relevant only to the extent that respondents can show *governmental* actions, because of the protected factors, which directly related to their trials in Northern Ireland or which will relate to their treatment after their ultimate release from prison.

■ (6) Further with respect to the issues of the treatment which respondents might expect after their release from prison: (a) It must be adverse treatment which will be exacted by the criminal justice system, which this court interprets as including actions by the government of the United Kingdom. (b) It must be additional punishment for respondents' crimes. And (c) it must be because of the protected factors, and not because of the crimes for which they were convicted.

■ (7) This court's decisions about the conditions which respondents can expect if they are extradited must focus on present and future circumstances. Evidence about past occurrences can be examined only for their probative value of what the present is and what the future might be.

## APPLICATION OF THE MAIN TREATY TO RESPONDENT BRENNAN

■ Before discussing the evidence and decisions under that defined scope, the court must turn first to respondent Brennan's contention that he be tried under the main treaty and not the Supplementary Treaty.

Brennan made a motion that his trial be conducted under Article V(1)(c) of the main Extradition Treaty, and not under Articles 2 and 3 of the Supplementary Treaty. On February 14, 1997 this court issued a short order denying that motion. It did so without preparing a written opinion of the reasons for the decision, since the trial date was imminent and the parties needed to know the conclusion and not the reasons. The court stated that it would later prepare a written opinion stating the reasons, which the court now does.

Brennan sought to be tried under the main treaty, rather than the Supplementary Treaty, in order to take advantage of the so-called "political" exception to extradition contained Article V(1)(c) of the main treaty. However, Article 1 of the Supplementary Treaty de-

fines certain offenses which are *not* "political" under the main treaty—in essence requiring that extradition proceedings for those offenses be conducted under Articles 2 and 3 of the Supplementary Treaty. Article 1(d) of the Supplementary Treaty provides that an offense is not political if it is an offense "involving the use of a bomb, ... if this use endangers any person."

Brennan contends that he was convicted of a "possession with intent" crime, which is not excluded by Article 1(d) of the Supplementary Treaty. Brennan cites extensively from the United States Senate hearings on the Supplementary Treaty to argue that crimes of "possession with intent" are not excluded by Article 1(d). However, regardless of the varying interpretations that are possible in a reading of the legislative history, the language of the Supplementary Treaty itself, which was ratified by the Senate, does exclude from the definition of political crimes those that involve "the use of a bomb" that "endangers any person."

This court has reviewed the records of Brennan's conviction in Northern Ireland:

(1) The petition for extradition in this case[3] defines Brennan's conviction as a violation of Section 3(b) of the Explosive Substances Act of the United Kingdom (the Act), and states that he was convicted of "possession of explosive substances" and "possession of explosives with the intent to injure."

(2) The Certificate of Conviction states that Brennan was convicted of possession or control of a bomb with the intent to endanger life or cause serious injury to property.

(3) The Judgment of Conviction establishes that Brennan and a companion were found guilty, following a trial, of a violation of Section 3(b) of the Act. Section 3(b) makes it unlawful to possess or control an explosive substance with the intent to endanger life or cause serious injury to property. The Judgment clearly states that Brennan possessed or controlled a bomb with the intent to endanger life or to cause serious injury to property. The Judgment itself does not contain an extensive discussion of the evidence. However, the Judgment states that Brennan

and his companion had a bomb and a gun, and were on their way to deposit the bomb in downtown Belfast, in the early afternoon on a business day, when they were caught by British soldiers.

(4) The factual record of Brennan's trial, which facts were also supported by the evidence in this extradition trial, established the following: Brennan and his companion were stopped by a British army patrol in downtown Belfast. They were in the city center in the early afternoon on a business day. They were carrying twenty-three pounds of explosives, gasoline, a timer, a detonator, a watch, and a gun. Brennan said that the bomb was for a shop in York Street, which is in the area where he and his companion were stopped. His accomplice told the police that Brennan had asked her to go with him "down to town to plant a bomb," and she testified that they were on an IRA mission. A forensic scientist testified that if the bomb had exploded in that area, it would have demolished the building and could have caused fatalities and serious injuries.

Is that conduct excluded from being a "political" offense by Article 1(d) of the Supplementary Treaty?

The court first notes that Article 1(d) of the Supplementary Treaty is not a listing of precise statutory offenses under the laws of the United Kingdom. It does not cite statutory names or sections. It is instead more generic. It says "an offense *involving....*" (emphasis added).

There are two objects of word "involving" in Article 1(d). One is "the use of a bomb," and the other is "endangers any person."

This court concludes that the offense of which Brennan was convicted involved "the use of a bomb." Brennan's bomb and its paraphernalia were essentially ready for installation and use. Brennan and his accomplice took the bomb, the paraphernalia, and the gun into the downtown area for the purpose of placing the bomb there at mid-day. Their plan was unsuccessful only because they were stopped before they could com-

---

**3.** Called a "Complaint For Provisional Arrest."

plete the deed. The court does not believe that the law must await an actual explosion before there is "use" of a bomb.

The court also concludes that Brennan's act involved endangering persons. The offense of which Brennan was convicted expressly includes the element of "endangering life" or causing serious injury. And it is evident that planting twenty-three pounds of explosives and gasoline in a downtown area at mid-day would endanger persons.

In summary, when one is carrying a large bomb, gasoline and detonating paraphernalia to place them in a downtown city area on a business day, and an arrest is the only thing that stops an explosion from occurring, that is an act "involving" "the use of a bomb" which "endangers any person."

The court therefore concludes that Article 1(d) of the Supplementary Treaty excludes Brennan's offense from being a "political" offense under the main treaty. Brennan's extradition must therefore be judged under the requirements of the Supplementary Treaty.

No similar argument was made by respondents Artt and Kirby. The offenses for which they were convicted are clearly ones within Article 1 of the Supplementary Treaty.

### THE TWO DEFENSES UNDER ARTICLE 3(a)

Although the language of Article 3(a) does not expressly use those words, the first clause of the article entitles respondents to prove that their convictions were "trumped-up" for the purpose of convicting them because of the protected factors. *Smyth* at 721. Respondent Artt contests his guilt. Respondent Brennan does not. And respondent Kirby contests one of his convictions but not the other.

The second clause of Article 3(a) focuses on the conditions which respondents can expect if they are extradited, both during their incarceration and subsequently upon their release from prison. All three respondents assert this provision of Article 3(a), and contend that they would be punished, detained or restricted in their personal liberty by reason of the protected factors.

### ALLEGED TRUMPED-UP CHARGES

■ Under the first clause of Article 3(a) respondents may attempt to prove that their convictions were "trumped up" for the purpose of convicting them because of the protected factors. This clause requires this court to inquire, to some degree, into whether respondents were actually guilty of the crimes of which they were convicted. The court says "to some degree," because this court is not a supreme court of review over the courts of the United Kingdom. It has no power to correct all errors that may allegedly have been committed by those courts, or to reexamine respondents' convictions using new evidence, American law or American procedure.[4] Rather, this court's function under the Supplementary Treaty is only to examine their convictions for the purpose of determining whether they were convicted because of the protected factors. If there is substantial evidence that they committed the crimes, and if the procedures in their convictions met standards of basic fairness, respondents cannot realistically carry their burden of proof that they were convicted because of the protected factors and not because of their guilt. Therefore, this court's relevant inquiry is not really one of guilt or innocence, but whether their convictions were because of crimes they committed or were because of the protected factors.

As stated, respondent Brennan does not contest his guilt of the crime for which he was convicted. Respondent Artt does. And respondent Kirby contests one of his convictions but not the other. With the causation standard—"because of"— in mind, this court now turns to an examination of the evidence and procedures in the conviction of Artt and one of the convictions of Kirby. Why were

---

**4.** *See Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Hooker v. Klein,* 573 F.2d 1360 (9th Cir.1978); *Messina v. United States,* 728 F.2d 77 (2d Cir.1984).

they convicted—for crimes they committed, or because of the protected factors?

### 1. *The Voluntariness of Respondents' Confessions*

The convictions of respondents Artt and Kirby were based heavily upon their confessions, both of which they now challenge.[5] This raises the issue of the extent to which this court can now inquire into the voluntariness of confessions admitted into evidence by the courts of the United Kingdom.

The Emergency Legislation of the United Kingdom provides that confessions that are obtained by torture or inhumane or degrading treatment will be excluded from evidence. That defined standard seems to be a lower standard for admissibility in terrorist cases governed by that legislation than in usual criminal cases in the United Kingdom. But the United Kingdom trial judges retained, and continued to exercise, discretion to exclude confessions that were obtained under circumstances not amounting to torture or inhumane or degrading treatment. They retained, and in Artt's case exercised, the power to consider whether ill treatment, oppression, prejudice or unfairness were present in the obtaining of the confession. Procedurally, respondents were required to establish at their trials a *prima facie* case of an improper confession. If they did so, the United Kingdom then bore the burden of proof that the circumstances of the confession met the standards for admissibility.

While the United Kingdom's standard is not identical to the standard for the admissibility of confessions under American law, it focuses on the same general inquiry. "[W]hether the processes were so unfair or unreasonable as to render a subsequent confession involuntary. Where the State's actions offended the standards of fundamental fairness under the Due Process Clause...." *Michigan v. Tucker,* 417 U.S. 433, 441, 94 S.Ct. 2357, 2362, 41 L.Ed.2d 182 (1974); accord, *Moran v. Burbine,* 475 U.S. 412, 466–

67, 106 S.Ct. 1135, 1164–65, 89 L.Ed.2d 410 (1986) (J. Stevens, dissenting).

██ That fundamental fairness must be examined by this court through one additional and slightly different lens; *i.e.,* the basic inquiry defined by Article 3(a). That is, were the confessions obtained on account of the protected factors? More specifically, in an extradition proceeding under the Supplementary Treaty, obtaining a confession by coercion may not be enough to exclude it unless it was obtained *because of* the protected factors, rather than because of respondents' alleged participation in a serious crime. As long as the courts of the United Kingdom applied a basic standard of fundamental fairness in their review of an allegedly coerced confession, and as long as those courts allowed a fair hearing on the issue, this court's inquiry must be limited to whether the confession was coerced because of the protected factors and not because of the offenses for which a respondent was arrested.

This court discusses that inquiry as to these respondents below. In Artt's case the issue of his confession was extensively litigated in his trial in Northern Ireland. In Kirby and Brennan's cases, they did not even raise an issue about their confessions in that court.

### 2. *The Convictions of Respondent Kirby*

██ Respondent Kirby was convicted in two separate trials of various offenses of violence, including felony murder, use of explosives, and possession of a firearm and explosives with the intent to injury. The two trials resulted from two separate events, approximately a week apart.

Kirby does not contest his conviction for the so-called Cranmore Gardens crimes, so this court need not go extensively into the facts of that conviction. It is sufficient to note that Kirby was convicted because he and his companions transported a bomb which exploded, and because they took hostages. Kirby was caught at the scene. As

---

**5.** Although respondent Brennan does not challenge his conviction, he did argue here that his

statements were coerced.

his accomplice testified, they were "caught red-handed." Kirby declined to recognize the Northern Ireland court that tried him. He was initially represented by counsel, but he discharged his attorney.

The second conviction arose from an armed robbery and the bombing of the Creighton Garage by four masked gunmen. The manager of the service station, Mr. Creighton, was shot and killed during the incident. And there was substantial damage when the bomb exploded.

The primary trial evidence linking Kirby to the incident was his own confession. When he was questioned after his arrest for the Cranmore Gardens event discussed above, Kirby admitted involvement in a number of bombings. The officers then brought up the events at Creighton's Garage. Kirby signed an advice of rights form, and after interrogation he eventually dictated and signed a statement. In his statement Kirby admitted that he was a member of the IRA. He stated that he had been directed to a particular meeting spot, where he joined three other men in a car. The car contained two bombs. When they got to Creighton's Garage, Kirby took one of the bombs and another man took the second. They ran into the garage. When Creighton attempted to interfere with the man carrying the other bomb, there was a fight and Creighton was shot and killed. Kirby primed his bomb and escaped, but he stated that he did not know that Creighton had been killed until he saw it on the evening news. He denied any intent to kill, and he denied that he was the one who had shot Creighton.

At his trial, Kirby accepted the assistance of counsel. It is important to note that he did not contend, either before his trial, at trial, or on appeal, that his statement was coerced, involuntary or untrue. The issue of his confession was never raised before the United Kingdom courts. Kirby's defense was that he could not legally be liable for the felony murder of Creighton because he had not anticipated the shooting. The court rejected that defense and convicted Kirby of felony murder.

In this extradition proceeding, Kirby contends that his conviction was based solely upon his confession, and that the confession was coerced as a result of three days of interrogation and torture.

Kirby did not testify in this extradition trial. And the United Kingdom denies that Kirby's statement was the result of any torture or other coercion. Nevertheless, the court must conclude from the evidence which was presented that Kirby was subjected to treatment during his interrogation which would not accord with standards permissible in American courts. But that is not the end of the inquiry.

It also appears from the record that the reasons for the interrogation were not so much, if at all, because of the protected factors, but because of the criminal activities with which he was charged. This is indicated by the seriousness of the offenses for which he was arrested, by his prior activities in 1972, and by his more extensive criminal record starting in 1975. The number and length of his interrogations is not surprising, in view of the large number of events that Kirby talked about. He confessed to the Cranmore Gardens incident within one hour of the start of his interrogation. And he admitted to being in the IRA since 1969. Because of that, he of course got heightened scrutiny from his interrogators. Kirby also confessed to five other offenses at the same time. He was charged with those offenses, but the charges were later dismissed when Kirby recanted part of his confession.

Kirby did not, however, recant his confession to the Creighton Garage offenses. The confession contained information which did not come from the police, and which could only have come from Kirby's recollections.

The events at Kirby's trial are particularly significant. As stated, he had the assistance of counsel. He did not allege that his statements were coerced, involuntary, or untrue. If he had done so and established a *prima facie* case regarding the coercion, the burden of admissibility would then have shifted to the government. His defense was that he could not legally be charged with the felony

murder of Mr. Creighton. And after his conviction, Kirby did not raise the issue of his confession in any appeal. While his failure to raise that defense in the courts of the United Kingdom does not necessarily *preclude* his raising the issue here, his failure to do so, as well as his not testifying in this trial, are significant here where Kirby bears the burden of proof.

The court finds that there was substantial evidence of Kirby's guilt of the death of Creighton and that the trial procedures were fair. The court therefore concludes that he was not convicted because of any of the protected factors, but because of the substantial evidence of his guilt.

### 3. *The Conviction of Respondent Artt*

■ Respondent Artt was convicted in 1983 of the 1978 murder of Albert Miles, the deputy governor of the Maze Prison, at Miles' home in Belfast. The RUC first arrested Artt in 1978 based on information linking him to the Miles' murder. Artt was questioned for several days, but was then released without being charged. In 1981, the police arrested Christopher Black, who gave them information about a number of criminal events and the people involved. One of those persons was Charles McKiernan, and the RUC then arrested McKiernan. McKiernan confessed to several crimes, including his role in the Miles murder. McKiernan identified Artt as the person who shot Miles. Based upon McKiernan's statement, the police arrested Artt. Artt was directly confronted by McKiernan, and on the third day of questioning, Artt confessed to the Miles murder.

In this extradition proceeding, Artt contends that he is innocent of the crime, and that his conviction was based entirely upon his involuntary confession.

#### (a) *The hearing on Artt's confession*

Prior to his trial in Northern Ireland, Artt moved for the exclusion of his confession. The trial court then conducted a suppression hearing concerning the confession. The hearing lasted for seven court days, and Artt testified for three days about the circumstances of the interrogation leading to his confession. Eleven RUC officers also testified at the hearing. Artt was given a full opportunity to offer evidence on all of the circumstances of his confession; indeed, the hearing was exhaustive.

Artt made several statements in his confession that were clearly his own statements, and which were obviously not fed to him by the police. Indeed, Artt admitted that he invented some of his statements in order to please the police or to please the court.

Following the testimony about the confession, Artt's attorney argued all of the possible grounds for finding the confession inadmissible, including physical mistreatment and threats. His counsel also argued the "inhumane treatment" standard, and asked for the exercise of the court's discretion. At the conclusion of the hearing, the trial court denied the motion to suppress the confession.

At the trial itself, Artt continued to deny that his confession was truthful. At the conclusion of the trial, the court articulated its power and its discretion to exclude the confession if Artt were subjected to ill treatment, oppression, prejudice or unfairness. The court made extensive factual findings, and found that Artt's confession was voluntary and that the circumstances of his interrogation did not require exclusion. This court need not recite all of those findings here. It is sufficient to say that an extensive hearing was held, and that the trial judge made findings and conclusions based upon the evidence. The court concluded:

> I have no doubt but that all his confessions were freely and voluntarily given, and I am satisfied that they should be given full weight. I find it incredible that a young man of Artt's common sense as well as intelligence should confess to a murder which he did not commit.... I am satisfied beyond reasonable doubt that Artt's confessions are true, that he was one of two gunmen who were sent out and did set out to kill Mr. Miles and that he deliberately shot at Mr. Miles with that intention and assisted in achieving the common purpose of murder.

This court will assume, as it did with Kirby, that the circumstances of Artt's interrogation were such that this court might find that the confession was involuntary if the issue were first presented here. But as discussed above, that is not the appropriate standard under which this court reviews the decisions of courts of the United Kingdom under the Supplementary Treaty. Rather, it is sufficient for this court to conclude, as it does, that Artt received a full and fair hearing, with an attorney, on the circumstances of his confession. The standard applied by the trial judge, while not totally parallel with the legal standard for a confession in an American court, met the basic standard of fairness. It was certainly not a confession coerced from Artt because of the protected factors, but rather because he had been implicated by an accomplice in the murder of Mr. Miles. The confession was also motivated by Artt's concern about the length of his possible sentence and its impact on his family.

### (b) *Claim of innocence*

In this proceeding, Artt introduced evidence to attempt to establish his innocence of the crime of which he was convicted. Artt presented certain evidence which might indicate his innocence, or which at least questions his guilt. But under the Supplementary Treaty, it is not the function of this court to simply retry Artt, either with the old evidence or with new. Rather, the issue is whether he was convicted because of the protected factors.

### (c) *Trial*

Artt was represented by an attorney at his trial in Northern Ireland. He was tried with approximately thirty-five other defendants, who had been implicated, directly or indirectly, by the evidence of Christopher Black. The trial lasted about eight months, but Artt's portion of the trial lasted only about one week. Artt was given the police statements and the other evidence against him ahead of time. Artt raised an alibi defense, but his only witnesses were his family members and his lady friend. His confession was of course the principal evidence against him, but that was also supported by the testimony of the interrogators who were called as witnesses. McKiernan's confession and plea also implicated Artt, and McKiernan never challenged his own confession. And as stated Artt testified and challenged the admission of his confession. The trial court found Artt guilty, and found that certain portions of his testimony were not credible. The procedural rights given to Artt were commensurate with basic standards of fairness in criminal cases.

In that regard, it should be noted that the convictions of several of Artt's co-defendants were overturned on appeal. However, if Artt did appeal (and it is not clear from the record that he did), his appeal was not considered, apparently because he escaped from the Maze Prison within just a few weeks after his conviction. The judges, both trial and appellate, are the same in the Diplock courts as in the ordinary criminal courts. Artt argued in this proceeding that the trial judge was a member of a Protestant Orange order, but no direct evidence of that was presented.

In summary, McKiernan's confession and his implication of Artt were certainly probable cause to arrest and try Artt for the murder. And that implication of Artt by McKiernan had nothing to do with the protected factors. Although the circumstances of his confession could be and were questioned, Artt received a full and fair hearing on that issue. With the admission of that confession and the related evidence, there was certainly substantial evidence against him. He received a fair trial that resulted in his conviction.

The court concludes that Artt was convicted because of the crime that he had committed, and not because of the protected factors.

### (d) *Pre–arrest events*

Artt introduced substantial evidence of events before his final arrest, in an attempt to establish that his trial and conviction were a result of the protected factors.

1. Artt was stopped at roadblocks in Belfast, and was otherwise observed and noted by the RUC and the army, numerous times. Artt infers from this that he was a special target of police attention. However, the

roadblocks were established around numerous areas throughout Belfast, both Catholic and Protestant, for the purpose of preventing violence. The existence and operation of those roadblocks would not meet our usual Fourth Amendment standards for stops and searches. But their purpose was obviously to prevent or reduce the wide-spread violence. Mr. Artt was a cab driver. His job required more frequent passage from one area to another, and he would naturally be more likely to encounter roadblocks and be observed by law enforcement. Artt was twice charged for his abusive conduct with the police at those stops. And he had been convicted of participating in a kneecapping in an IRA operation in June 1978. He was thereafter a person more likely to attract police observation.

The court therefore concludes that these events of stopping, observing and noting Artt were matters that resulted from the very presence of the roadblocks, which impacted both the Catholic and Protestant communities, and from Artt's prior criminal record.

2. Artt presented evidence of an event which occurred in late December 1980, when Artt and Mr. Alexander Sloan were confronted by four armed men in a police car. The men had police uniform pants, but civilian coats. Artt and Sloan feared that they were an armed Loyalist gang. Sloan and Artt ran from their confronters, and were chased back into the residence. However, the incident terminated with no physical violence, no threats, no shots and no arrests.

The evidence did not demonstrate any threats or actions against Artt or Sloan by the occupants of the car with respect to any of the protected factors. In fact, other residents confronted the car on the street; more police then arrived and the event terminated without further incident. Artt filed a complaint about the event, but was never told the results. Again, while the incident is one which certainly would not or should not occur on an American street, this court cannot find that it had any causal connection to Artt's arrest following McKiernan's confession, or to Artt's conviction for the murder of Mr. Miles.

3. A more serious event occurred in September of 1979 at the residence of a Mr. and Mrs. Heathwood. Artt was a boarder at that residence. Mr. Heathwood was murdered in the bottom floor of his residence by persons and for reasons never identified. Artt testified that he went to the police station shortly after the shooting, and that he was told in effect that the shooting was meant for him. And Artt testified that the RUC said something to him to the effect that, "I hope they get you."

Contrary testimony was given in this trial by retired RUC officer Norman Cromie, who handled the investigation of the Heathwood killing. Cromie said that he did not know that Artt had been living at the Heathwoods. Cromie talked to Artt when Artt went to the police station. Cromie made notes about the conversation, and neither those notes nor Cromie's testimony indicate that Artt was identified as being the intended target. He denied threatening Artt or saying anything about the future.

Although the killing has not been solved, Cromie testified that Artt made no complaint about the investigation, or about how long it took to secure the area around the residence after the killing was first reported (as Artt did in this trial). It appears from the record as a whole that the RUC did a competent job of investigating the shooting, but were unable to identify the killers. The only evidence which the court heard about the shooting being directed at Artt was Artt's statement. It was contradicted by Cromie, and there is no other evidence to support Artt's statement of the alleged threat to him. The court therefore cannot conclude by a preponderance of the evidence that the incident had any causal connection to Artt's arrest in 1981 or to his conviction.

4. Sometime in 1979, the RUC allegedly told Artt that he was a marked man; that is, that he was a target for attack by Protestant–Loyalist paramilitaries. He therefore applied for a gun permit, but the permit was denied. However, the testimony indicated that Artt had made some falsehoods, or at least some misstatements, in his application

for a gun. That, combined with the natural desire of the security forces not to have more guns on the streets, was certainly a reason for denying his application unrelated to the protected factors. And in 1980 Artt was provided with a change of residence for purposes of his security.

In sum, there has not been sufficient evidence of any causal connection between these pre-arrest events and Artt's later arrest and conviction. Even if these events were probative of Artt's allegations of having been prosecuted for the Miles murder because of the protected factors, any such causal connection was broken or at least offset by McKiernan's confession and his implication of Artt. That alone is evidence of a neutral reason for Artt's arrest and prosecution.

## THE SPECIAL DEFENSE OF RESPONDENT BRENNAN

As stated, respondent Brennan does not contend that he was not guilty of the crime of which he was convicted in Northern Ireland; rather, he admits his guilt. Nor does he assert that those charges against him were "trumped up" for the purpose of convicting him because of the protected factors. The facts of his offense are discussed above. It is therefore not necessary for this court to engage in a detailed discussion of the evidence of his criminal conduct.

However, because of one additional defense which Brennan raises to extradition, and which is considered in this section, further mention of his trial procedures in Northern Ireland are appropriate. Brennan refused to recognize the jurisdiction of the court that tried him. He was offered an attorney to assist in his defense, but he discharged the attorney. At his trial, the evidence against him was presented by prosecution witnesses, including testimony of verbal statements which Brennan gave to the RUC interrogators. Brennan put on no defense. He did not challenge the admissibility of his statements. Based on all of the evidence in the record, the court found him guilty, and Brennan did not appeal.

 Brennan now raises one special defense to his extradition which is not raised by the other respondents. It results from the fact that at the time of his capture the arresting British soldiers beat him; and they beat him again in an army holding facility. This was before he was turned over to the RUC for investigation and prosecution. Brennan concedes that he was not beaten after he was in the custody of the RUC. However, for purposes of considering Brennan's defense, this court does not draw a fine line between the actions of the army and of the RUC. The events were close in time. And it is at least arguable that the beating by the army had some impact on his admissions, two days later, to the RUC.

Brennan asserts the beating as a bar to his extradition. He argues that under international law there is a humanitarian exception to extradition which should apply here. And he similarly argues that this was outrageous governmental behavior which bars his extradition. These two arguments are essentially similar, and really differ only in the language of the decisions which Brennan cites in support of those propositions. Brennan also lately asserts in this case that this court should deny extradition because, if this were a criminal case in the United States, his conviction would be reversed on the ground that it was based upon his coerced verbal statements.

Brennan's principal authority for a humanitarian international law exception to extradition is *dicta* in *Gallina v. Fraser*, 278 F.2d 77 (2nd Cir.1960), at p. 79. He also cites to dicta in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), at pp. 431–32, 93 S.Ct. at 1642–43. However, Brennan concedes that no court has applied those *dicta* to deny an extradition.

Brennan's arguments run afoul of the basic foundation for the jurisdiction of this court, the treaties between the United States and the United Kingdom. Outside of the defenses defined in those treaties, here the Article 3(a) defenses, this court has no jurisdiction to deny extradition even if this court believes that there was inhumane conduct. Unless the defense is one defined in the treaty, only the Secretary of State of the United States

has the discretion to refuse extradition on humanitarian grounds. *Quinn v. Robinson,* 783 F.2d 776, 789–90 (9th Cir.1986).

Nor does the Ninth Circuit authority cited by Brennan support the conclusion for which Brennan argues. In *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983), the court stated that it could imagine situations where persons to be extradited would be subjected to procedures so antipathetic to a federal court's sense of decency as to require reexamination of the general principles upholding extradition. But the court did not apply that *dicta* there. And it also noted that the *Gallina dicta* had yet to be employed in any extradition case. In *Wang v. Reno,* 81 F.3d 808 (9th Cir.1996), the Ninth Circuit enjoined Wang's removal from the United States. But it was on the basis of protecting Wang as a result of the *United States'* duty to protect him as a witness, and because the *United States* had violated his due process rights. The court looked to the future conduct which Wang might expect. But no remedy was granted, as Brennan requests here, for anything that had happened to Wang at the time of his arrest in the foreign country.

Numerous decisions from other circuits have affirmed the rule that it is not the role of the courts, but rather the role of the Secretary of State, to determine whether extradition should be denied on humanitarian grounds. See *e.g. Sidali v. INS,* 107 F.3d 191, 195 n. 7 (3rd Cir.1997); *Martin v. Warden,* 993 F.2d 824, 830, n. 10 (11th Cir.1993); *Ahmad v. Wigen,* 910 F.2d 1063, 1067 (2nd Cir.1990); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.1980); *Sindona v. Grant,* 619 F.2d 167, 174 (2nd Cir.1980); *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir. 1976).

In the face of such authority, and under the language of the treaties between the United States and the United Kingdom, this court cannot apply unspecified international law, or general humanitarian principles of international law, to deny extradition based upon what occurred to Brennan at the time of his arrest.

In view of that authority, this court need not consider in detail Brennan's argument that if this were a domestic criminal case his conviction would be reversed because of his beating by the army. Brennan would have to establish a causal connection between the beating, his statements admitted into evidence, and his conviction. However, the trial judge in Brennan's case explained that the basis for his finding of guilt was the overwhelming evidence of Brennan being caught with the bomb and its paraphernalia. As the judge said, Brennan was "caught red handed." In addition, the trial judge did make inquiry into Brennan's physical condition.[6]

This court's decision is not meant to condone such violence by arresting authorities. Some anger by the arresting soldiers, intercepting a person about to place a deadly bomb, is humanly understandable. But it is not a permissible act in the processes of criminal justice. Nevertheless, the scope of this court's power to inquire into the issue is restricted by the treaties. The Supplementary Treaty defines the defenses to extradition which this court can consider, and permits no others. And Brennan's cited authorities for a humanitarian exception have not been recognized by courts as a permissible inquiry under this or any other treaty.

## *FUTURE TREATMENT OF RESPONDENTS IN NORTHERN IRELAND*

Since the court has concluded that the charges against respondents were not trumped up, and that they were convicted fairly because of the evidence of their guilt and not because of the protected factors, the court now passes to the second defense under Article 3(a) of the Supplementary Treaty. That is, respondents contend that if they are surrendered to the United Kingdom they will be "punished, detained or restricted in their personal liberty by reason of the protected

---

6. This court further notes that after his beating, Brennan was given medical treatment, and photographs were taken of him, which does not indicate any attempt by the RUC to hide the facts in the hope of having his statements admitted.

factors." This defense involves two settings for analysis. First, the treatment that respondents might receive if they are returned to the Maze Prison. Second, the treatment which they might receive upon their ultimate release from prison.

### 1. *Maze Prison*

 There is no certainty that respondents will indeed be returned to the Maze Prison, rather than to some other penal institution in Northern Ireland. There was evidence that they will not be housed there unless they request it, and unless the Republican–Nationalist group of prisoners agrees to accept them. But James Smyth was returned there, and this court will assume for purposes of this discussion that respondents will be returned there also.

The court heard extensive testimony about conditions in the Maze Prison over a period of several years prior to the mass escape in 1983. The court can only conclude from that evidence that the conditions were terrible and that some prisoners were treated in ways which would not be condoned in an American prison. However, the evidence also showed that some of those conditions were the result of protests which were initiated and participated in by the prisoners themselves; for example, the "blanket protest," the accelerating "dirty protest," and the hunger strike. These were actions initiated by the prisoners because they wanted to be treated as prisoners of war, but were treated as convicted criminals with attendant restrictions on their dress, communications, and work requirements. Since the prisoners initiated those protests, they cannot complain about certain of their consequences. The excusable consequences of course do not include brutality by the prison staff. But conditions resulting from their refusal to wear prison clothing, to clean themselves (and indeed to spread filth), and to eat were acts of their own doing. Respondent Brennan participated in the blanket protest, the dirty protest, and the hunger strike. Respondent Kirby participated in some. Respondent Artt was in the prison for only a few weeks, and the record does not indicate whether he participated in any protests.

In addition, the United Kingdom stipulated that immediately following the mass escape in 1983, the recaptured prisoners, and even some prisoners who did not attempt to escape, were brutalized by the guards. Some of the guards, none of whom have been disciplined for those events, are still employed at the Maze. Those events resulted in damages awards in favor of approximately seventy prisoners, although it appears that the awards were not actually paid to the prisoners but were offset against other charges allegedly owed by them.

To what extent is that evidence indicative of the conditions which might be faced by these respondents if they are returned to the Maze? The events disclosed by the evidence were several years ago, at least 14 years ago. And the testimony which the court heard in this trial establishes that *present* conditions in the Maze are very much improved. Even the Republican–Nationalist prisoners who testified in this case by video deposition corroborated that conditions have improved. Respondents' witnesses indicated that no Maze prisoner has ever been killed by a guard, and that there have been very few alleged beating incidents since 1983. The two extremist groups are now segregated to avoid potential violence between them. The Republican–Nationalist prisoners now have prisoner of war status, and hence a greater degree of control over their own daily affairs. The facilities and privileges are much improved, and the prisoners negotiate with the prison authorities over numerous matters.

The improved conditions include 24–hour telephone service, rooms for education and programs, space which the prisoner groups can decide how to use, and freedom to move and mingle within the wings of the prison. No guards or staff are armed. Sports, recreation, handicraft, and exercise are available every day. And there is virtually unlimited freedom to study Irish culture, and to freely exercise religion. Prisoners have the right to communicate with anyone on the outside, and the visiting policy is liberal. There are even home leaves from the prison.

Witnesses pointed out, however, that conditions within the prison can reflect the events occurring in Northern Ireland. That is, increased violence in Belfast and the surrounding area could produce more repressive conditions within the prison. That may well be true as a general matter. But the potential for future change—good or bad—cannot offset the testimony of even the Republican–Nationalist prisoners that the Maze Prison is presently humane and liberal.

Respondents also argue that some prison guards who served in the prison at the time respondents were there either are, or may be, a part of the present prison staff. And respondents note that the guard staff is overwhelmingly Protestant. However, this court cannot regulate the balance of personnel in the prison system of another country. And the testimony discussed above certainly indicates that the present makeup of the guard staff is not having an adverse impact on the current conditions in the Maze.

Respondents also argue that certain guards are members of the Orange orders, and some may have participated in the 1996 Orange marches which produced violence and controversy in Drumcree in 1996. There is no regulation against police or prison staff being members of an Orange order. But participation in marches could violate their sworn obligations of impartiality. The only direct evidence was that two guards may have participated in the 1996 march. One of those guards had already retired in 1995. The second denies the charge, but is under investigation and review. And the burden of proof necessary to discipline a guard is no longer beyond a reasonable doubt, but is now a balance of the probabilities.

One measure of the probability of what respondents can expect in the Maze can be found in the treatment of other prisoners who have been returned there through extradition. James Smyth has returned to the Maze and, with one exception discussed below, he has not been the subject of any adverse acts. In addition, another escapee who was later extradited from Holland has also not received any harsher treatment.

The one exception involving Smyth is an event that occurred earlier this year, after the conclusion of the evidence in this trial. The authorities at the Maze discovered an escape tunnel running from a Republican–Nationalist wing of the prison towards the exterior wall. The tunnel was detected before there was an escape. The prison authorities obviously reacted. And respondents contend that there was brutality, including to James Smyth. However, it appears from the communications which the court has received that any injury to Smyth was temporary and not serious. And respondents really argue the event as being indicative of the treatment of Republican–Nationalist prisoners generally. Even if there were injuries, it is obvious that the motivating factor was the escape tunnel. It was not because Smyth or any of his fellow prisoners were Catholic, Republican or Nationalist. For legitimate penological reasons, some severe limitations on the rights and freedoms of prisoners should reasonably be expected when prison authorities discover an escape tunnel. That does not excuse brutality to the prisoners, if that in fact occurred. But it is obvious that if there were any such harm, it would be because of the attempted escape from that wing of the prison and not because of the protected factors.

Respondents request to reopen the evidence and to take additional discovery on this event. But the court is denying those requests. The evidence in this case has closed. And it is obvious that the escape tunnel was a specific and significant event, and one independent of prison conditions generally. Even if respondents were able to establish that violence resulted to the prisoners as a result, it would not establish the causal connection to the protected factors that is necessary for the Article 3(a) defense.

The court concludes that respondents have not established by a preponderance of the evidence that they would receive abusive treatment in the Maze Prison because of the protected factors.

### 2. *Conditions After Respondents' Release From Prison*

What treatment might respondents receive after their ultimate release from prison? The scope of this inquiry was defined by this court, for purposes of both the pretrial proceedings and the trial, as follows: (a) It must be adverse treatment which will be exacted by the criminal justice system, which this court interprets as including action by the government of the United Kingdom. (b) It must be additional punishment for respondents' crimes. And (c) it must be because of the protected factors, and not because of the crimes for which respondents were convicted.

### (a) *Alleged collusion*

██ Respondents' principal contention is that upon their release from prison, they will be the subject of attacks by Protestant–Loyalist paramilitary groups. Indeed, respondents allege collusion between such paramilitary groups and the RUC and prison authorities to give the paramilitary groups information about them.

In 1980 the RUC told Artt that a Loyalist organization had some information regarding him and had targeted him for an assault. Artt was told that the RUC had found the information in an RUC raid on a Loyalist group. Artt was given no additional information, either as to the identity of the group possessing the information or the nature or source of the information. There is no evidence that respondents Brennan or Kirby were similarly warned. The fact of such a warning indicates two things. The first is that Loyalist paramilitary groups can assemble information about Republican–Nationalists, or at least about Artt. But it does not establish where the information came from. It also indicates a concern by the RUC for Artt's safety. To that extent, it shows fairness and a lack of collusion. If the RUC were indeed colluding with a para-military group to attack Artt, it is highly unlikely that the RUC would have warned him about it. In addition, Artt got approval for new housing from the government and was moved for his safety.

There was no direct evidence of collusion between the RUC and paramilitary organizations, or direct evidence of the deliberate leaking of information by the RUC itself. There was indirect evidence of an incident of one Brian Nelson, who was prosecuted for the offense of leaking information from police records. But other than the incident involving Artt, there was no evidence of collusion or leaks concerning respondents. The evidence on collusion was instead secondary.

Witness Jane Winter testified on behalf of respondents. She is a social anthropologist who works with certain human rights groups on issues involving Northern Ireland. She did research on the question of collusion and prepared a report in October 1996. Her report discussed alleged illegal activities by the security forces with para-military groups, the alleged failure of the police to deter those acts, and the alleged failure of the judicial system to vindicate the rights of victims. She expressed the opinion that there is some collusion, although it is not a policy of the RUC. And she criticized the failure of the RUC to recognize and stop the problem. Her sources were necessarily limited. She did not have the cooperation of the government, and she could not get information from the paramilitary groups. Her report deals primarily with the allegations of collusion made by its alleged targets. Because of the limited sources of her information, her conclusions must be given only the weight of a one-sided point of view; that is, expressing the issue solely from the side of the alleged victims. This is not a criticism of her integrity, but her conclusions are in part driven by the limited sources of her information. Her report was also not balanced, in that she did not discuss possible contrary inferences from the same evidence, and did not discuss the possibility of other factors causing the events which she reported.

She also expressed the opinion that these respondents will be natural targets of Protestant Loyalist groups upon their release, because of their high profile resulting from their escape from the Maze Prison and these extradition proceedings. That subject is discussed below.

The court also heard evidence of an inquiry and report prepared by a Mr. Stevens on the subject of alleged collusion. He was appointed by the RUC to conduct an investigation and to prepare a report when public accusations of collusion were made. The Stevens report indicates that there was some evidence of leaks, but that it is limited. And Stevens believes that leaks can never be totally eliminated by a security organization.

The deputy governor of the Maze Prison, Mr. Woods, testified about the current procedures for the security of information about prisoners. He testified that the files on the prisoners are kept in a secure facility, and that security measures over the records have steadily increased, probably as a result of the Stevens report. When prisoners are released from the prison, the RUC is notified by the prison authorities. But the RUC does not get the files of the prisoners. There was also evidence that in the past when prisoners were released, some photos were made available to the RUC. However, the testimony was that even that procedure stopped after the Stevens report.

Mr. White, the assistant chief constable of the RUC, testified, as could be expected, that there was certainly no policy of collusion between the RUC and any outside group. He also said that since the Stevens report, the RUC's security over its records has increased significantly. He stated that the RUC has a policy of warning targets of paramilitary groups when it learns that those groups have obtained such information, from any source. Such a warning is particularly appropriate if the paramilitary group is planning some kind of action. No more detailed information is given to the individuals, because of the danger of a breach of security. Mr. White testified that the paramilitary extremist groups—on both sides—have their own intelligence gathering functions and sources. He testified that potential Republican-Nationalist targets of violence are treated in the same manner as potential Loyalists targets of violence. And he said that information which *allegedly* came from the RUC has been found in the hands of Republican-Nationalist groups as much as Loyalist groups.

The RUC does monitor, for approximately one to five years, released prisoners who were convicted of terrorist offenses. But the monitoring includes both Loyalist and Republican-Nationalist prisoners.

The court cannot find by a preponderance of the evidence that respondents will be the subject of collusion between the RUC or prison authorities with Protestant-Loyalist groups, or that information about them will be leaked by the prison or by the RUC to those groups. There is undoubtedly some risk. In the setting of the violence conducted by the extremist groups on both sides, and because of the position of the RUC and the prisons between those two groups, a risk of leaks cannot be totally eliminated. Nevertheless, that is not the result of deliberate government action or policy. Insofar as governmental action could even be accused of being implicated, it would not be because of the protected factors, since the same security concerns apply to both the Republican-Nationalist prisoners and the Loyalist prisoners. Rather it would be because of respondents having been convicted and incarcerated for crimes of violence.

Certainly because of their crimes, because of their escape, and because of their extradition, respondents will have a higher visibility than other released prisoners. And they will be monitored to a certain extent by the RUC. But those are again factors that result from their commission of the crimes, and not from the protected factors.

### (b) *Belfast generally*

■ Respondents also raise the issue of adverse circumstances which they might face in the Belfast community generally, beyond their allegations of police collusion.

There is little doubt that respondents will be known and visible names upon their release into the community. There was testimony about what their lives might be like at that time. There was testimony that they might fear to go outside of the Catholic areas within Belfast, that they might be in danger from Loyalist groups, and that they might have difficulty getting jobs.

A lot of respondents' evidence and arguments have their source in the general conditions in Northern Ireland which have been discussed above. Much of the evidence was presented by respondents' families about mistreatment in their communities, most of it in the years before respondents' arrests, at the hands of the police, the army, and paramilitary groups. The mistreatment included unprovoked stops and searches, rough physical treatment, warrantless searches of residences, internment, and religious taunts and name calling. Such actions were intrusive and offensive to any sense of human rights, but were grounded in the warlike conditions at the time. Respondents offered that evidence in part to establish that the charges brought against them were "trumped up" because of the protected factors. But this court has already determined that respondents were properly convicted because of their crimes of violence. So respondents also offer that evidence as indications of the circumstances which they will face upon being returned to their communities.

There was however very little evidence of *present* conditions. Most of the evidence again came from respondents' family members, and most expressed only their opinions that life will be difficult for respondents because of their visibility. But little was said about specific, present conditions.

There was also contrary evidence. On the subject of jobs, there was testimony that certain of respondents' family members have *government* jobs. That is hardly indicative of any retaliatory attitude by the government. And if respondents have difficulties locating jobs because of economic factors or because of the decisions of private employers, that is not governmental action proscribed by the Supplementary Treaty. There was also evidence that some former prisoners receive government welfare, again not indicative of any retaliatory action. The United Kingdom also argues that respondents could move from Northern Ireland to the Republic of Ireland, because citizens of Northern Ireland are also citizens of the Republic. This argument, while relevant, has little weight; that is, a person should not be compelled to move from his home in order to avoid retaliation, if retaliation exists.

Respondents have also made frequent arguments concerning the annual marches of the Orange orders through Catholic–Republican–Nationalist neighborhoods. Respondents call those marches as "triumphalism," which they may well be. And they argue that the marches have government sanction, which may also be true to the extent of parade permits and crowd control. But gain, those marches are factors of the general strife in Northern Ireland. There is no evidence that they are in any way directed against respondents or are related to their convictions.

In looking at these conditions in Belfast, this court must again return to the defined subjects under its jurisdiction. The court cannot resolve the historical conflicts that are still existing, and cannot fashion protections for everyone returned to that environment. As stated in the Supplementary Treaty, and as defined by the Ninth Circuit and by this court, the inquiry must be limited to whether respondents will face adverse circumstances as a result of *government* conduct and *because of the protected factors*. This court cannot find that the difficulties which respondents might face will be the result of any governmental action, except for limited matters discussed above. The court must also conclude that the general conditions under which respondents must live in Northern Ireland are caused by history and by respondents' crimes, and not by the protected factors.

*CONCLUSIONS*

Lacking the power or the wisdom to solve the problems of Northern Ireland, the court must—as it has done above—retreat to the issues that are within its jurisdiction: Based upon the evidence which the court has heard, were respondents convicted on account of their race, religion, nationality or political opinions? Or if they are extradited to Northern Ireland, will they be punished, detained or restricted in their personal liberty by reason of their race, religion, nationality

or political opinions? The court concludes, by a preponderance of the evidence, that the answer to both questions is no.

Respondents were convicted because they committed serious crimes, not because they are Catholics or Nationalists or Republicans. They are indeed members of those groups. And their membership in those groups might have been their motivation for the commission of their crimes. But they were convicted for their crimes, and not for their beliefs. A killing is still a crime, regardless of the banner under which the criminal stands when he kills. And if returned to Northern Ireland, respondents' further punishment will not be because of their beliefs, but because of the crimes which they committed.

Therefore, under the requirements of 18 U.S.C. Section 3184, this court hereby certifies the extraditability of respondents Artt, Brennan, and Kirby, and orders their commitment.

IT IS ORDERED that the above decisions are certified to the Secretary of State of the United States in order that a warrant may issue upon the requisition of the proper authorities of the United Kingdom for the surrender of Kevin Barry John Artt, Pol Brennan, and Terence Damien Kirby according to the provisions of the Extradition Treaty and the Supplementary Treaty between the United States and the United Kingdom.

IT IS FURTHER ORDERED that a copy of all testimony taken before this court, and all documents received in evidence, be forwarded to the Secretary of State.

IT IS FURTHER ORDERED that Kevin Barry John Artt, Pol Brennan, and Terence Damien Kirby are committed to the custody of the United States Marshal, or his authorized representative, to be confined in an appropriate facility and to remain for surrender to the United Kingdom pursuant to applicable provisions of treaty and law.

IT IS SO ORDERED.