158 F.3d 462
 98 Cal. Daily Op. Serv. 7709, 98 Cal. Daily
Op. Serv. 8447,
98 Daily Journal D.A.R. 10,687,
98 Daily Journal D.A.R. 11,748
In the Matter of the REQUESTED EXTRADITION OF Kevin John ARTT.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kevin John ARTT, Defendant-Appellant.
In the Matter of the REQUESTED EXTRADITION OF Pol BRENNAN.
UNITED STATES of America, Plaintiff-Appellee,
v.
Pol BRENNAN, Defendant-Appellant.
In the Matter of the REQUESTED EXTRADITION OF Terence Damien KIRBY.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terence Damien KIRBY, Defendant-Appellant.
 Nos. 97-10386, 97-10387 and 97-10390.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 14, 1998.
Decided Oct. 9, 1998.
As Amended Nov. 17, 1998.
 
 Dennis Riordan and Donald M. Horgan, Riordan & Rosenthal, San Francisco, California, for defendant-appellant Pol Brennan.
 James J. Brosnahan and Mark W. Danis, Morrison & Foerster, San Francisco, California, for defendant-appellant Barry Artt.
 Gilbert Eisenberg, Filippelli & Eisenberg, Thomas Eastridge, San Francisco, California, for defendant-appellant Terence Kirby.
 Sara Criscitelli and Mark Zanides, United States Department of Justice, Office of International Affairs, Washington, DC, for plaintiff-appellee.
 John F. Henning III, San Francisco, California, for amicus.
 Appeals from the United States District Court for the Northern District of California; Charles A. Legge, District Judge, Presiding. D.C. Nos. CR-92-00151-MISC-CAL, CR-93-00032-MISC-CAL, CR-94-00086-1-MISC-CAL.
 Before: GOODWIN, FLETCHER, and D.W. NELSON, Circuit Judges.
 Opinion by Judge D.W. NELSON; Partial Concurrence and Partial Dissent by Judge GOODWIN.
 D.W. NELSON, Circuit Judge:
 
 
 1
 Pol Brennan, Kevin Barry John Artt, and Terence Damien Kirby ("the appellants") appeal the district judge's decision to certify them for extradition to the United Kingdom, pursuant to 18 U.S.C. § 3184 and the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972-Oct. 21, 1976, U.S.-U.K., 28 U.S.T. 227 (entered into force Jan. 21, 1977) (the "1977 Treaty"), as modified by the Supplementary Treaty Concerning the 1977 Treaty, June 25, 1985, U.S.-U.K., reprinted in S. Exec. Rep. No. 17, 99th Cong., 2d Sess., 15-17 (1986) ("Supplementary Treaty"). See Matter of Artt, 972 F.Supp. 1253 (N.D.Cal.1997).
 
 
 2
 The appellants raise a number of defenses to extradition. They argue collectively that the extradition scheme established by Section 3184, the 1977 Treaty, and the Supplementary Treaty, unconstitutionally violates the doctrine of separation of powers and may not be used as a basis for their extradition. Alternatively, they claim that the district judge misapplied the extradition treaties to their individual cases.
 
 
 3
 As we discuss below, our jurisdiction over this appeal arises in part from Article 3(b) of the Supplementary Treaty and in part from 28 U.S.C. § 1291. Although we commend the district judge for his thoughtful and thorough disposition of the issues raised by these cases, we conclude that he erred in applying the Supplementary Treaty to Appellant Brennan's case. We also conclude, with regard to the cases of Appellants Artt and Kirby, that the district judge incorrectly defined the scope of inquiry under the first clause of Article 3(a) of the Supplementary Treaty. Accordingly, we reverse and remand for further proceedings in all three cases.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 Beginning in 1973, the United Kingdom ("U.K.") enacted sweeping emergency legislation in its effort to stem the violence arising from the conflict in Northern Ireland. See generally Northern Ireland (Emergency Provisions) Act, 1978, ch.5 (consolidating emergency criminal provisions enacted between 1973 and 1978). This legislation eliminated a number of the pretrial procedural safeguards typically available to criminal defendants in Great Britain and Northern Ireland. See Note, Questions of Justice: U.S. Courts' Powers of Inquiry Under Article 3(a) of the United States-United Kingdom Supplementary Extradition Treaty, 62 Notre Dame L.Rev. 474, 479-81 (1987). It also established an alternative system of legal tribunals to try those accused of "scheduled offenses," i.e., certain politically-motivated criminal offenses. These "Diplock" courts, named after the chairman of the parliamentary commission that created them, employ abbreviated trial procedures, eliminating trial by jury and significantly relaxing evidentiary standards. See id. at 481-84; see also In the Matter of the Extradition of Smyth, 61 F.3d 711, 713 (9th Cir.1995).
 
 
 5
 The appellants in the instant cases are Catholics from Northern Ireland. Each of them was convicted of criminal offenses by the Diplock court system. Pol Brennan was convicted in 1977 of possession of explosives with intent to endanger life or injure property and was sentenced to 16 years in prison. Terence Kirby was convicted in 1978 of possession of an explosive device, possession of a submachine gun, assault, false imprisonment, and felony murder, and was sentenced to life imprisonment. Barry Artt was convicted in 1983 of murdering a prison official and was sentenced to life imprisonment plus fifteen years.
 
 
 6
 In September 1983, all three escaped from the Maze Prison where they had been incarcerated, and made their way to the United States. When their identities were discovered, the United Kingdom requested their extradition pursuant to the 1977 Treaty. United States authorities arrested Artt in June 1992, Brennan in January 1993, and Kirby in February 1994.
 
 
 7
 After extensive discovery and a protracted bench trial, the district judge certified the appellants for extradition. Matter of Artt, 972 F.Supp. 1253, 1274-75 (N.D.Cal.1997). The judge determined that the United Kingdom had met its burden under the 1977 Treaty of establishing that the appellants had been convicted of extraditable offenses in Northern Ireland. Id. at 1256. The judge also concluded that the offenses of which all three appellants were convicted fell within the scope of the Supplementary Treaty and that, as a consequence, the appellants were barred from raising a defense to extradition under Article Five of the 1977 Treaty, which prohibits extradition for political offenses. Id. at 1260-62. Finally, the judge concluded that none of the appellants had succeeded in establishing a defense to extradition under Article 3(a) of the Supplementary Treaty. Id. Brennan, Artt, and Kirby timely appeal.
 
 STANDARD OF REVIEW
 
 8
 The interpretation of treaties is a legal question subject to de novo review. United States v. Michael R., 90 F.3d 340, 343 (9th Cir.1996). An extradition tribunal's factual determinations are reviewed for clear error. Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1405 (9th Cir.1988).
 
 ANALYSIS
 
 9
 These cases present a number of issues of first impression. We consider, first, the appellants' challenge to the constitutionality of the extradition scheme which, they assert, violates the doctrine of separation of powers by exposing judicial decisions to executive branch review and by requiring judges to act in an extrajudicial capacity. We also review the appellants' claim that the United States was a necessary party to the extradition proceedings on account of the unique role established for it by the Supplementary Treaty. We then proceed to the individual appellants' claims that the district judge misconstrued various provisions of the Supplementary Treaty.
 
 
 10
 Before addressing these issues, however, we think it useful to review the extradition scheme governing our disposition of this appeal.
 
 The Extradition Scheme
 
 11
 The legal framework governing these appeals is defined by three legal instruments: Title 18 U.S.C. § 3184, the 1977 Treaty, and the Supplementary Treaty. Section 3184, the federal extradition statute, confers jurisdiction on "any justice or judge of the United States" or any authorized magistrate to conduct an extradition hearing pursuant to a treaty between the United States and another nation. 18 U.S.C. § 3184. The 1977 Treaty between the United States and the United Kingdom provides for the reciprocal extradition of persons accused or convicted of specified criminal offenses. The Supplementary Treaty, which is centrally at issue on this appeal, modifies the 1977 Treaty.
 
 
 12
 The United States and the United Kingdom adopted the Supplementary Treaty in 1985 in an effort to resolve increasing tensions arising from a series of extradition decisions by United States courts. See Smyth, 61 F.3d at 714. The Supplementary Treaty alters the extradition procedures in force under the 1977 Treaty in three significant ways: (1) it limits the scope of the political offense exception; (2) it authorizes a degree of judicial inquiry into the factors motivating a request for extradition; and (3) it creates a limited right to appeal an extradition decision. We discuss each of these changes in turn.
 
 
 13
 1. Article 1: Limits on the Political Offense Exception
 
 
 14
 Although judicial officers presiding over extradition proceedings typically refrain from " 'inquir[ing] into the procedures or treatment which await a surrendered fugitive in the requesting country,' " Smyth, 61 F.3d at 714 (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir.1983)), most extradition treaties contain an important exception to this rule, permitting a more probing judicial inquiry when the extraditee has been accused of a political crime. See generally Quinn v. Robinson, 783 F.2d 776, 792-803 (9th Cir.1986) (describing origins and application of political offense exception). The 1977 Treaty contains a typical formulation of this exception: It provides that extradition is not to be granted if "the offense for which extradition is requested is regarded by the requested party as one of a political character." 1977 Treaty, art. 5. Beginning in 1979, the political offense exception served as the basis for several decisions by United States courts to deny the extradition of members of the Provisional Irish Republican Army ("PIRA") to the United Kingdom. See Smyth, 61 F.3d at 714 (listing decisions). These decisions raised the ire of both the British government, which condemned the decisions as condoning terrorism, and the United States Departments of Justice and State, which feared that such decisions would have an adverse effect on law enforcement and foreign relations. Id.
 
 
 15
 The Supplementary Treaty was conceived as a means of limiting the scope of the political offense exception. See S. Exec. Rep. No. 99-17, at 1-2 (1986) ("Senate Report"). Article 1 of the Supplementary Treaty lists a number of specific criminal offenses that no longer may be "regarded as an offense of political character." Id. at 15. Among the crimes included on this list are murder, hostage-taking, and offenses "involving the use of a bomb ... if this use endangers any person." Id. Also included are attempts to commit any of the listed crimes. Id. Article 1 of the Supplementary Treaty therefore makes the political offense exception inapplicable to most violent crimes.
 
 2. Article 3(a): Limited Judicial Inquiry
 
 16
 As originally drafted, the Supplementary Treaty would have eliminated the political offense exception entirely. Senate Report at 3. Because of continuing concerns in the United States Senate about the fairness of the system of justice in Northern Ireland, however, a unique provision was inserted to ensure that "American Judges have more than the usual authority to inquiry [sic] into that system, and to ensure that those we extradite will in fact get a fair trial." 132 Cong. Rec. S16,806 (daily ed. July 14, 1986). Of particular concern to the Senate was the Diplock court system in Northern Ireland. See In re Extradition of Howard, 996 F.2d 1320, 1331 (1st Cir.1993); see also 132 Cong. Rec. 16,806-19 (1986) (discussing procedures employed by Diplock courts).
 
 
 17
 In its final form, the Supplementary Treaty contains the following provision:
 
 
 18
 Notwithstanding any other provision of this Supplementary treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained, or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions.
 
 
 19
 Supplementary Treaty, art. 3(a). Thus, while Article 1 of the Supplementary Treaty substantially curtails the application of the political offense exception, Article 3(a) authorizes extradition judges to examine the factors motivating a request for extradition and, more broadly, "the treatment the accused will likely receive at the hands of the requesting country's criminal justice system." Smyth, 61 F.3d at 715.
 
 
 20
 In particular, Article 3(a) permits two distinct inquiries: The first clause of Article 3(a) authorizes the judge to reject a request for extradition "based upon a persuasive factual showing that the requesting party has trumped-up charges against a dissident in order to obtain his extradition for trial or punishment." Senate Report at 4. The second clause gives the judge the authority to deny extradition if the accused person can demonstrate "by a preponderance of the evidence that he would be prejudiced at his trial, or punished, detained, or restricted in his personal liberty because of his race, religion, nationality, or political opinions." Id.
 
 
 21
 3. Article 3(b): Limited Appeal from Extradition Decisions
 
 
 22
 Extradition orders generally are nonappealable. See generally Matter of Mackin, 668 F.2d 122, 125-30 (2d Cir.1981). The United States Supreme Court established and explained this practice in In re Metzger, 46 U.S. (5 How.) 176, 12 L.Ed. 104 (1847), in which the Court determined that it lacked appellate jurisdiction over a district judge's extradition decision. Observing that the matter had been "heard and decided by the district judge at his chambers, and not in court," id., 46 U.S. (5 How.) at 191, the Court concluded that the district judge was exercising "a special authority, and the law has made no provision for revision of his judgment. It cannot be brought before the District or Circuit Court; consequently, it cannot, in the nature of an appeal, be brought before this court." Id. 46 U.S. (5 How.) at 191-92. Thus, the Court held that extradition orders are not appealable because they are not decisions of the district court but, rather, are decisions of the district judge acting under "a special authority."
 
 
 23
 That distinction has remained a central feature of extradition jurisprudence. Although Congress eventually enacted statutes to provide specifically for the involvement of judicial officers in extradition proceedings, those statutes were not intended to affect the appealability of extradition orders, see Mackin, 668 F.2d at 126-28, and courts at all levels have consistently upheld the rule articulated in Metzger, see id. at 127 (citing cases).
 
 
 24
 Article 3(b) of the Supplementary Treaty authorizes a limited but clear departure from this established rule. It provides, in pertinent part: "A finding under paragraph (a) shall be immediately appealable by either party to the United States district court, or court of appeals, as appropriate." Supplementary Treaty, art. 3(b). Thus, to the extent that an extradition decision is based upon a finding under Article 3(a), "the Supplementary Treaty contemplates at least one appeal as of right." Howard, 996 F.2d at 1326. As discussed below, the parties dispute what constitutes a "finding" under Article 3(a) and, more generally, whether the appellate scheme established by Article 3(b) is constitutional.
 
 
 25
 We proceed to the appellants' claims.
 
 
 26
 I. The extradition scheme established by 18 U.S.C. § 3184 and the Supplementary Treaty is constitutional.
 
 
 27
 As noted above, section 3184 authorizes federal district judges to decide whether there is probable cause to believe that the potential extraditee committed an offense covered by a given extradition treaty. If the judge determines that probable cause has not been established, extradition is refused. If, however, the judge finds the evidence sufficient to sustain the charges,
 
 
 28
 he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention....
 
 
 29
 18 U.S.C. § 3184. Thus, although the extradition judge decides whether to certify the charges in a request for extradition, once the charges are certified, the Executive Branch makes the ultimate decision about whether to extradite.
 
 
 30
 In the instant cases, the appellants maintain that the extradition scheme established by section 3184, as modified by the Supplementary Treaty, unconstitutionally violates the doctrine of separation of powers. They make two alternative arguments. They contend, first, that the statute impermissibly gives the Executive Branch the authority to review the decisions of Article III courts. Alternatively, they argue that, to the extent that the statute requires Article III judges to act in an extrajudicial capacity, it compromises the judiciary's "reputation for impartiality and nonpartisanship." Mistretta v. United States, 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The district court rejected these arguments when it denied the appellants' pretrial motion to dismiss the extradition proceedings.
 
 
 31
 These arguments present us with issues of first impression. The Second Circuit recently rejected virtually identical arguments in the context of a habeas corpus challenge to an extradition order. See Lo Duca v. United States, 93 F.3d 1100, 1105-10 (2d Cir.1996). The Seventh Circuit also rejected a similar constitutional challenge on a habeas corpus petition, although it approached the issue from a different route. See DeSilva v. DiLeonardi, 125 F.3d 1110, 1115 (7th Cir.1997). However, neither court addressed the unique extradition scheme established by the Supplementary Treaty.
 
 
 32
 A. We have jurisdiction to review the appellants' constitutional challenge to the extradition scheme.
 
 
 33
 As an initial matter, the United Kingdom argues that we lack jurisdiction over the appellants' constitutional challenge to the extradition scheme. It points out that Article 3(b) of the Supplementary Treaty authorizes appeals only from findings made pursuant to Article 3(a). Because extradition orders are not otherwise subject to appeal, Collins, 252 U.S. at 369, 40 S.Ct. 347, the United Kingdom contends that the district judge's conclusion regarding the constitutionality of the extradition scheme is not subject to direct appeal.
 
 
 34
 The text of Article 3 supports the United Kingdom's position. Although Article 3(b) does make a clear departure from the norm of nonappealability of extradition decisions, see Howard, 996 F.2d at 1326, it makes only a small departure. In pertinent part, Article 3(b) provides that "[a] finding under [Article 3(a) ] shall be immediately appealable by either party." Supplementary Treaty, art. 3(b). The central question, therefore, is whether the constitutionality of the extradition scheme created by Article 3 constitutes a "finding under Article 3(a)." As discussed above, Article 3(a) authorizes the "judicial authority" to make a limited inquiry into the motivations for a request for extradition and the system of justice to which the extraditee will be returned. Accordingly, an extradition judge's Article 3(a) findings are, in large part, findings of fact.
 
 
 35
 The appellants suggest that our decision in Smyth indicates that the resolution of issues bearing on Article 3(a) findings also comes within the purview of Article 3(b). In Smyth, however, we reviewed the district court's discovery and evidentiary rulings only insofar as those rulings related to construing the scope of inquiry under Article 3(a). See Smyth, 61 F.3d at 720-21. In contrast, the appellants' constitutional claim does not involve analyzing the proper construction of Article 3(a). Rather, the appellants ask us to repudiate an entire treaty-statutory scheme of which Article 3(a) is only a small part. Nothing in the language of Article 3(b) authorizes such a broad inquiry at the appellate level. Thus, although Article 3(b) gives us jurisdiction over the appellants' appeal from the district judge's Article 3(a) findings, it does not give us jurisdiction over their constitutional claims.
 
 
 36
 We conclude, however, that we have jurisdiction to decide these claims under 28 U.S.C. §§ 1291 and 2253. Our decision is informed by our disposition of an appeal brought by the United Kingdom at an earlier phase of this litigation. See In the Matter of the Requested Extradition of Kirby, 106 F.3d 855, 859-63 (9th Cir.1996). On that appeal, we held that a district judge's decision to grant or deny bail is not an extradition decision of the district judge under 18 U.S.C. § 3184. We observed that section 3184 provides only that an extradition judge certify that there is sufficient evidence to sustain the charges against the potential extraditee and "contains no provisions for bail whatsoever." Id. at 859. Accordingly, we concluded that the bail decision is a final decision " 'of the district court ' within the meaning of section 1291." Id. at 859 (emphasis added).
 
 
 37
 The same reasoning applies to the instant appeal. The district judge did not have the authority as a district judge acting pursuant to section 3184 to decide a constitutional question. His inquiry under section 3184 was limited to ascertaining whether adequate evidence had been proffered to support the United Kingdom's requests for the extradition of Brennan, Artt, and Kirby. Thus, the district judge was acting pursuant to a different authority when he denied the appellants' pretrial motion raising the constitutional question.
 
 
 38
 Under 28 U.S.C. § 2241, the district court has the authority to issue a writ of habeas corpus if a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. Although the appellants did not invoke section 2241 in their pretrial motion, we treat the appellants' pretrial motion raising the constitutional challenge as a petition for writ of habeas corpus. See United States v. Brown, 413 F.2d 878, 879 (9th Cir.1969) (treating petition filed under Federal Rule of Civil Procedure 35 as a habeas corpus petition); see also United States v. Kin-Hong, 110 F.3d 103, 116 (1st Cir.1997) (flexibly applying principle that federal courts of appeals rule only on issues first decided by district court in order to avoid unnecessary costs and delays); Quinn v. Robinson, 783 F.2d 776, 814 (9th Cir.1986) (observing that court of appeals is more likely to address question without prior district court review if question is purely legal). Because a decision to deny a habeas petition is a final decision of the district court, not an extradition decision by the district judge, cf. Kirby, 106 F.3d at 859, we have jurisdiction over the appellants' appeal from that decision, see 28 U.S.C. §§ 1291 & 2253.
 
 
 39
 Having determined that we have jurisdiction to decide appellants' constitutional claims, we proceed to the merits.
 
 
 40
 B. Title 18 U.S.C. § 3184 does not impermissibly confer upon the Secretary of State the power to review legal determinations by Article III courts.
 
 
 41
 Article 3(b) of the Supplementary Treaty confers jurisdiction on United States district courts and courts of appeals to hear appeals from findings under Article 3(a) of the treaty. The appellants point out that, under 18 U.S.C. § 3184, after a judge has decided to certify a request for extradition, the Secretary of State retains the discretion ultimately to deny the request for extradition. According to the appellants, the Supplementary Treaty consequently exposes the decisions of Article III courts to review and revision by the Executive Branch, in violation of the doctrine of separation of powers. See, e.g. Plaut v. Spendthrift Farms, Inc., 514 U.S. 211, 218, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch."). But see Lopez-Smith v. Hood, 121 F.3d 1322, 1327 (9th Cir.1997) ([T]he extradition statutes do not violate separation of powers doctrine.)
 
 
 42
 In recent opinions, the Second and Seventh Circuits have addressed similar constitutional challenges to section 3184 on habeas corpus review of extradition decisions under other treaties. In Lo Duca, the Second Circuit concluded that section 3184 posed no constitutional problem because judges serving as extradition officers under section 3184 are not exercising the judicial power of the United States. Lo Duca, 93 F.3d at 1105. The Second Circuit based its decision on the fact that section 3184 refers not to "courts," but to "judges." Id. at 1107. The appellants in the instant case make much of this distinction. As they point out, Article 3(b) of the Supplementary Treaty authorizes appeals from Article 3(a) determinations to the "United States district court, or court of appeals." Supplementary Treaty, art. 3(b). They argue that this treaty language clearly subjects the decisions of an Article III court to Executive Branch review.
 
 
 43
 We are not persuaded by the appellants' argument. Even if we are acting as an Article III court when we review the district judge's Article 3(a) findings on appeal, there is no indication that our decision is subject to Executive Branch "review" such that the doctrine of separation of powers is violated. On this point, we find the Seventh Circuit's decision in DeSilva, particularly instructive. The DeSilva court concluded that section 3184 did not violate the doctrine of separation of powers because, like a search warrant or an order approving deportation, "it authorizes, but does not compel, the executive branch of government to act in a certain way." 125 F.3d at 1113. The court reasoned that section 3184 consequently does not require Article III courts to give advisory opinions that are subject to Executive Branch review:
 
 
 44
 Judgments give victorious litigants rights but not duties; only the losers are placed under obligations, and a judgment may be called "advisory" only when it does not bind the unsuccessful litigant. A victor in civil litigation may forego collecting the award of damages; no one thinks that this makes the judgment advisory. The police need not search, the Attorney General need not deport, the victorious plaintiff need not collect--and the Secretary of State need not extradite.
 
 
 45
 Id. at 1113. We adopt the Seventh Circuit's reasoning and reject the appellants' claim.
 
 
 46
 C. Section 3184 does not unconstitutionally require judicial officers to act in an extrajudicial capacity.
 
 
 47
 The appellants also argue that, to the extent that section 3184 compels judges to act in an extrajudicial capacity, it undermines the integrity of the judicial branch. Citing the Supreme Court's decision in Mistretta, the appellants suggest that judicial involvement in extradition proceedings permits "the political Branches to cloak their work in the neutral colors of judicial action." 488 U.S. at 407, 109 S.Ct. 647.
 
 
 48
 We recognize that the inquiry authorized by Article 3(a) of the Supplementary Treaty implicates sensitive international relations concerns that are the usual province of the political branches. This role is not, however, entirely new to the judiciary. We have undertaken similar inquiries in both the immigration context, see, e.g., Rodriguez-Roman v. INS, 98 F.3d 416, 430-31 (9th Cir.1996) (assessing treatment asylum applicant is likely to encounter from justice system in his country of origin), and the extradition context, see Quinn, 783 F.2d at 792-803 (describing political offense exception). As the Second Circuit observed in Lo Duca, moreover, "For nearly 150 years, federal judges have adjudicated extradition complaints under section 3184 with no indication of any adverse consequences. Of course, this is hardly surprising since an extradition proceeding is 'an essentially neutral endeavor and one in which judicial participation is peculiarly appropriate.' " 93 F.3d at 1110 (quoting Mistretta, 488 U.S. at 407, 109 S.Ct. 647). The appellants present no compelling reason to depart from the Second Circuit's considered judgment.
 
 
 49
 Thus, we reject the appellants' constitutional challenge to the extradition scheme. Next, we consider the appellants' claims that the district judge misapplied the 1977 Treaty and the Supplementary Treaty to their individual cases.
 
 
 50
 II. We lack jurisdiction to review the district judge's application of Article Two of the Supplementary Treaty.
 
 
 51
 The district judge made a pretrial ruling that the United Kingdom successfully had established probable cause for the appellants' extradition under Article Two of the Supplementary Treaty by proving that the appellants are the persons sought and that they have been convicted of crimes in the United Kingdom. See Artt, 972 F.Supp. at 1256. Artt challenges the court's ruling, arguing that Article Two of the Supplementary Treaty imposes an affirmative obligation on an extradition court to decide in each case whether sufficient evidence indicating criminality exists to accept that the respondent committed the alleged crime. Artt contends that the district court failed to satisfy that obligation by declining to conduct a hearing to evaluate whether there was sufficient evidence of Artt's criminality to sustain the charge against him.
 
 
 52
 We lack jurisdiction to consider this claim. The jurisdiction of the federal courts of appeals is defined (and circumscribed) by statute. In re Vylene Enter., Inc., 968 F.2d 887, 889 (9th Cir.1992). It cannot be expanded by judicial decree. Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Traditionally, appellate courts have lacked jurisdiction to hear appeals from extradition orders. Collins v. Miller, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920). Although Article 3(b) of the Supplementary Treaty permits appeals from Article 3(a) findings, there is no indication either in the text of the provision or in its legislative history that it was intended to confer jurisdiction over appeals from extradition decisions under Article Two. See Senate Report at 8. Moreover, the drafters of the treaty saw Article 2 as "a distillation of settled U.S. law." Senate Report at 7. We consequently decline to construe Article Two as a departure from the settled norm that extradition orders are not appealable unless they fall within a statutory or treaty-defined exception.
 
 
 53
 III. The United States is not a necessary party to an extradition hearing held under the Supplementary Treaty.
 
 
 54
 The appellants observe that, unlike all other extradition treaties, the Supplementary Treaty requires the United States to undertake a delicate inquiry into the circumstances of an extraditee's conviction. They suggest that the dual role assigned to the United States--as neutral arbiter and as representative of the U.K.--has resulted in a conflict of interest. Specifically, they claim that the United States failed to fulfill its responsibility under Article IX of the 1977 Treaty to request information essential to determining whether extradition was proper.
 
 
 55
 The appellants' argument has little merit. First, although it is clear that the Supplementary Treaty authorizes a searching inquiry into Northern Ireland's justice system, see Howard, 996 F.2d at 1330, it is equally clear that it assigns that role entirely to the judicial branch of the United States Government, see Supplementary Treaty, art. 3 (assigning role of evaluating defenses to extradition to "competent judicial authority"); 132 Cong. Rec. 16,806 (remarks of Senator Biden) ("And we felt it was necessary that American judges have more than the usual authority to inquiry [sic] into that system."). The appellants provide no evidence that the judicial branch's capacity to undertake that inquiry and to protect individual rights in a neutral fashion has been compromised.
 
 
 56
 Second, the appellants never clarify how the participation of the United States as a party would have prevented the problems that they allege to have arisen from the United States' conflict of interest. They complain that the U.K. allegedly coached a witness, that it refused to make certain important documents and witnesses available to the defense, and that it withheld governmental reports documenting collusion between the police and paramilitary groups in Northern Ireland. The appellants do not explain, however, what role the United States could have played in resolving these disputes had it been a party to the proceedings. Indeed, the appellants argued below that the district judge had the power, pursuant to Article IX(3) of the 1977 Treaty, to compel witnesses and enforce discovery requests. We are unable to identify any additional interest that would be served by the United States' participation as a party to the extradition proceedings.
 
 
 57
 IV. The district judge erred in determining that the Supplementary Treaty is applicable to the extradition of Appellant Brennan.
 
 
 58
 On September 10, 1976, security forces stopped Appellant Pol Brennan and a companion, Ann Marie Quinn, on a street in Belfast and searched them. Brennan was carrying a revolver, and Quinn was carrying a bomb containing approximately 23 pounds of explosives. The bomb was wired to a detonator, battery, and watch. Brennan told the police that he had been instructed to deliver the gun and the bomb for collection by someone else. Quinn later testified, however, that she and Brennan had been on a bombing mission for the Irish Republican Army.
 
 
 59
 In May 1977, a Diplock court convicted Brennan of two offenses: (1) possession of explosives with intent to endanger life or injure property, and (2) unlawful possession of a weapon. The court sentenced Brennan to 16 years in prison. Like Artt and Kirby, Brennan was incarcerated at the Maze Prison until his escape in 1983. The United Kingdom now seeks to extradite Brennan to require him to serve out his sentence for the possession of explosives conviction.
 
 
 60
 Prior to his extradition hearing, Brennan moved to have his case considered under the 1977 Treaty, rather than under the Supplementary Treaty. Brennan claimed that, because the offense of which he was convicted is not specifically listed in Article One of the Supplementary Treaty, the district judge should decide his extradition under the provisions of the 1977 Treaty. The district judge rejected this argument, determining that Brennan had been convicted of a listed offense, namely an offense involving the use of a bomb. Artt, 972 F.Supp. at 1260-62. We disagree.
 
 
 61
 We begin our analysis of this question with the text of the Supplementary Treaty. See Air France v. Saks, 470 U.S. 392, 396-97, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). Article One provides, in pertinent part: "For the purposes of the Extradition Treaty, none of the following shall be regarded as an offense of a political character ... (d) an offense involving the use of a bomb, grenade, firearm, letter or parcel bomb, or any incendiary device if this use endangers any person." Supplementary Treaty, art. 1.
 
 
 62
 Brennan and the U.K. agree that analysis of this question should begin with the words of the Supplementary Treaty, but they disagree about which words are important. The United Kingdom argues that we should focus on the word "involving." According to the United Kingdom, possession of a bomb with intent to use it is an offense "involving" the use of a bomb. The United Kingdom cites United States v. Contreras, 895 F.2d 1241, 1244 (9th Cir.1990), in which we found that possession of narcotics with the intent to distribute them constituted a "drug trafficking crime" where that term was defined as " 'any felony violation of Federal law involving the distribution, manufacture or importation of any controlled substance.' " Id. at 1244 (quoting 18 U.S.C. 924(c)(1)) (emphasis added). The United Kingdom submits that there is no principled distinction between possession of drugs with intent to distribute them and possession of a bomb with intent to use it.
 
 
 63
 Brennan contends that the operative word in Article 1(d) is not "involving" but, rather, "use." He insists that possession with intent to use simply does not constitute "use." In support of his position, Brennan cites the Supreme Court's opinion in Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). In Bailey, the Court held that the term "use" in the context of a particular sentencing statute "must connote more than mere possession of a firearm by a person who commits a drug offense." Id. at 143, 116 S.Ct. 501. The Court instead required a showing of "active employment of the firearm." Id.
 
 
 64
 Because we find both of these interpretations of the Supplementary Treaty's language to be plausible, we consult the drafting history to determine the parties' intent. See Air France, 470 U.S. at 396-97, 105 S.Ct. 1338; Factor v. Laubenheimer, 290 U.S. 276, 294-95, 54 S.Ct. 191, 78 L.Ed. 315 (1933); see also In re Extradition of Howard, 996 F.2d 1320, 1326 (1st Cir.1993)("[I]f the language of a treaty is at all ambiguous, courts may look to legislative history in interpreting its provisions under virtually the same rules that obtain when courts interpret statutes.")
 
 
 65
 Our examination of the drafting history compels us to conclude that Brennan's offense does not fall within the scope of the Supplementary Treaty. We note that the Senate rejected an earlier version of Article 1(d) that would have disallowed application of the political offense exception to "the making [or] possession of an explosive substance by a person who intends either himself or through another person to endanger life or cause serious damage to property." The Impact of the Supplementary Treaty upon American Domestic Law and upon the American Constitutional Process in the Fight Against Terrorism: Hearing Before the Subcomm. on the Constitution of the Comm. on the Judiciary, 99th Cong. 20 (1985) ("Draft Supplementary Treaty"). Moreover, the Executive Report prepared by the Committee on Foreign Relations specifically acknowledges that the new version eliminates "references in the original Supplementary Treaty to property damage, possession, intent and conspiracy." Senate Report at 4. Finally, testimony on the Senate floor indicates that this change was motivated by concerns about the Diplock court system's capacity fairly to resolve questions of intent. See United States and United Kingdom Supplementary Treaty: Hearings Before the Senate Comm. on Foreign Relations, 99th Cong., 1st Sess. 40 (1986) (statement of Senator Kerry).
 
 
 66
 We are unpersuaded by the United Kingdom's argument that the Senate intended to eliminate from Article I only possession with intent crimes involving firearms or ammunition and not those involving bombs. Had the Senate desired to treat explosives and firearms differently, it very easily could have drafted separate provisions for each. Indeed, the initial version of the provision did treat firearms and explosives separately. See Draft Supplementary Treaty at 20.
 
 
 67
 We consequently reverse the district judge's determination that Brennan's offense falls within the scope of Article 1(d) of the Supplementary Treaty. Accordingly, we remand to the district judge for consideration of whether Brennan's offense constitutes a "political offense" under Article 5 of the 1977 Treaty.
 
 
 68
 V. The district judge did not clearly err in finding that the appellants will not be punished on account of their religion and political beliefs if they are extradited.
 
 
 69
 Brennan, Artt, and Kirby raise defenses to extradition under the secondclause of Article 3(a) of the Supplementary Treaty (the "future treatment clause"). They claim that they will be punished on account of their religion and political beliefs if extradited to Northern Ireland. The district judge rejected this claim, concluding that the appellants had failed to establish that they would be punished on account of religion or political belief either at the Maze Prison ("the Maze"), where they are likely to be returned, or upon their release from prison. Artt, 972 F.Supp. at 1270-74. We review the judge's findings of fact for clear error. United States v. Kohli, 110 F.3d 1475, 1476 (9th Cir.1997).
 
 
 70
 Our determination that Brennan's offense does not fall within the scope of Article 1(d) of the Supplementary Treaty precludes his claim for relief under Article 3(a) of the Supplementary Treaty. We consider the defenses of Artt and Kirby on the merits.
 
 
 71
 In Smyth, we defined the nature and scope of the inquiry under the future treatment clause. James Smyth was convicted of the attempted murder of a prison official in 1978 and was sentenced to 20 years imprisonment. Like the appellants in the instant case, Smyth escaped from the Maze in 1983 and made his way to the United States. A number of years later, the United Kingdom requested Smyth's extradition to serve out his prison term. In proceedings before the district judge, Smyth successfully asserted a defense to extradition under the second clause of Article 3(a). Id. at 716-18. We reversed, concluding that Smyth had failed
 
 
 72
 to demonstrate by a preponderance of the evidence that the criminal justice system in Northern Ireland likely would exact additional retribution for his crime beyond the remaining term of imprisonment, and that such additional punishment would be inflicted on account of Smyth's political or religious beliefs, and not on account of his having attempted to murder a prison guard.
 
 
 73
 Id. at 720. We acknowledged that this was "a difficult burden." Id.
 
 
 74
 The appellants in the instant case submitted extensive evidence before the district court indicating that the conditions at the Maze during the period of their incarceration there were deplorable. They pointed out that some of the prison guards who served prior to the appellants' escape in 1983 continue to be employed at the Maze and argued that they are likely to suffer abuse or prejudice upon their return, particularly in view of the fact that the prison staff is overwhelmingly Protestant. The appellants also introduced expert testimony suggesting that, upon their release from prison, they would be subject to attacks by Protestant/Loyalist paramilitary groups, acting in collusion with the Northern Ireland police force.
 
 
 75
 The district court judge concluded that the appellants had failed to establish that they were more likely than not to suffer abusive treatment on account of the protected factors in either setting. The judge found the evidence regarding conditions at the Maze prison to be largely dated and inadequately indicative of present conditions, which the judge called "humane and liberal." Matter of Artt, 972 F.Supp. at 1271. The judge based this conclusion on evidence indicating that prisoners at the Maze have access to 24-hour telephone service and to sports and recreation facilities, that they are free to mingle and move within wings of the prison, and that their cultural and religious rights are respected. Id. at 1270. He also based it on his finding that James Smyth, who has been incarcerated at the Maze since his extradition from the United States, has not been subject to "any adverse acts" on account of his religion or political beliefs. Id. at 1270.
 
 
 76
 Similarly, the judge was unable to find by a preponderance of the evidence either that the appellants would be subject to abuse by the police force and prison officials or that they would face other forms of persecution by the government on account of religious or political factors. Id. at 1272-74. The judge noted that there was no direct evidence of collusion between the police and Loyalist paramilitaries, and he found the expert testimony presented by the appellants to be inconclusive. Id. The judge also found most of the evidence regarding general conditions in Belfast too dated to have any probative value. Id. at 1274. Although Appellant Artt has asked us to take notice of new information indicating that sectarian violence in Northern Ireland is escalating, he has provided no evidence of official involvement. See Smyth, 61 F.3d at 715 (noting that focus of Article 3(a) inquiry is treatment at hands of "requesting country's criminal justice system").
 
 
 77
 We have carefully reviewed the evidence presented by the appellants. In view of the strict standard imposed by Smyth, we conclude that the district court did not clearly err in determining that the appellants failed to meet their burden under the second clause of Article 3(a).
 
 
 78
 VI. The district judge improperly construed the first clause of Article 3(a) of the Supplementary Treaty.
 
 
 79
 Appellants Artt and Kirby also cite the first clause of Article 3(a) (the "Aquino clause"[1]) as a defense to extradition.[2] The Aquino clause provides:
 
 
 80
 [E]xtradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions....
 
 
 81
 Supplementary Treaty, art. 3(a). Artt and Kirby claim that their Northern Ireland convictions were based on false confessions obtained under coercive conditions. They argue that they would not have been convicted were it not for anti-Catholic and anti-Republican bias in the Northern Ireland justice system. Accordingly, they submit that the United States should deny extradition on the ground that the requests for extradition have been made in order to punish them on religious and political grounds.
 
 
 82
 The proper construction of the Aquino clause is an issue of first impression in this Circuit, and no other court of appeals has had occasion to address it. Writing on a blank slate, the district judge framed the inquiry under the Aquino clause as follows:
 
 
 83
 As long as the courts of the United Kingdom applied a basic standard of fundamental fairness in their review of an allegedly coerced confession, and as long as those courts allowed a fair hearing on the issue, this court's inquiry must be limited to whether the confession was coerced because of the protected factors and not because of the offenses for which a respondent was arrested.
 
 
 84
 972 F.Supp. at 1263 (emphasis added). Applying that standard, the district judge determined that, while both Artt and Kirby had suffered "treatment during ... interrogation which would not accord with standards permissible in American courts," that treatment arose from the nature of the criminal activities with which they were charged, not from political or religious animus. Id. at 1264.
 
 
 85
 We conclude that, although the district judge correctly framed the question before him, he took the wrong approach to answering it. Before trial, the judge issued an order defining the scope of inquiry in these cases. The order provided that "[t]he proceedings may include enquiry into whether the convictions of the respondents were to try or to punish them because of the protected conduct." All evidence, however, had to be "directly related to the respondents" and could not involve "generalized enquiries into [the] Diplock court system." Thus, the judge limited his inquiry to evidence of prejudice in the appellants' individual cases and declined to allow the appellants to develop their allegations of broader systemic bias. See Artt, 972 F.Supp. at 1263-64.
 
 
 86
 We believe that the district judge defined the scope of inquiry under the Aquino clause too narrowly. The existence of bias is not always readily apparent from an individualized inquiry, particularly where, as in Northern Ireland, procedural safeguards have been eliminated. After all, a trial judge or detective is unlikely to memorialize the fact that his or her decisions were motivated by political or religious bias. See Bolanos-Hernandez v. INS, 767 F.2d 1277, 1285 (9th Cir.1984) ("Persecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution."). As a result, a defendant, lacking the panoply of procedural protections typically accorded the accused in the Anglo-American system, is left vulnerable to the silent prejudices of judicial and law enforcement officers. Absent an opportunity to present more generalized evidence of bias, the defendant shoulders the impossible burden of identifying clear signs of individualized prejudice within the opaque procedures employed by the Northern Ireland justice system.
 
 
 87
 The United States Supreme Court has made it "unmistakably clear" that more generalized inquiries such as statistical analyses " 'serve an important role' " when the existence of discrimination is in dispute. International Bhd. of Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (citations omitted); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (approving use of statistical evidence in proving that allegedly nondiscriminatory reasons for employment decision were pretextual). Although we have adopted a cautious approach to weighing the probative value of statistical evidence, we have unequivocally recognized "the importance of statistics as circumstantial evidence of discriminatory intent." Atonio v. Wards Cove Packing Co., Inc., 827 F.2d 439, 444 (9th Cir.1987). We have also found generalized statistical evidence relevant in the criminal context. See Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995) (racial discrimination in jury selection).
 
 
 88
 Applying these precedents to our analysis of the Aquino clause, we hold that, if a potential extraditee establishes prima facie that significant procedural abuses occurred before or during trial, he or she may present evidence of systemic bias within Northern Ireland's justice system during the relevant time period.
 
 
 89
 Our holding is consistent with our decision in Smyth. Smyth's claims implicated only the second clause of Article 3(a). See Smyth, 61 F.3d at 716. The fairness of the proceedings that led to Smyth's conviction consequently was not before us. Rather, we undertook a largely prospective inquiry, i.e., whether Smyth had demonstrated that he would be a target of politically-motivated abuse by the justice system upon his return to Northern Ireland and, ultimately, upon his release from prison. Id. at 719. Accordingly, we held that the district court erred in its reliance on general evidence of discrimination within the Diplock court system. Id. at 720. As we pointed out, "That evidence does not relate to the treatment Smyth is likely to receive as a consequence of extradition." Id. (emphasis added).
 
 
 90
 In contrast, where, as here, a potential extraditee challenges a past conviction, the inquiry under the Aquino clause is largely retrospective. The Aquino clause authorizes courts to ensure that a criminal conviction is legitimately grounded in fact and is not merely serving as a subterfuge for religious or political persecution. Individualized evidence will be most relevant to this inquiry. When there is a genuine dispute as to whether facially nondiscriminatory decisions were tainted by religious, political, or racial bias, however, general statistical evidence may also be relevant.
 
 
 91
 Our holding is also consistent with the drafting history of the Aquino clause. The drafters clearly envisioned at least a limited inquiry at the systemic level. See Senate Report, at 5 (authorizing inquiry as to whether extraditee will be denied fair trial "because of the court system ")(emphasis added); 132 Cong. Rec. 16,798 (remarks of Senator Kerry) (noting that Article 3(a) inquiry involves "the fairness of the system of justice to which a fugitive would be extradited")(emphasis added); 132 Cong. Rec. 16,806 (remarks of Senator Biden) (noting that colloquy in official legislative history "signal[s] this body's intention to create a right of inquiry into the fairness of a foreign judicial system ") (emphasis added).
 
 
 92
 Thus, we reverse the orders certifying Appellants Artt's and Kirby's extraditions and remand with instructions to the district judge to consider whether Artt and Kirby have established prima facie cases that significant procedural abuses occurred before or during their criminal trials in Northern Ireland. If the district judge determines that Artt and Kirby have carried this burden, they should be given an opportunity to present evidence of political or religious bias in the Northern Ireland justice system during the period of their convictions.
 
 CONCLUSION
 
 93
 We reverse and remand to the district court with instructions to (1) evaluate the request for Appellant Brennan's extradition under the 1977 Treaty, and (2) determine whether Artt and Kirby have established a prima facie case of significant procedural abuses before or during their criminal trials in Northern Ireland.
 
 
 94
 REVERSED AND REMANDED.
 
 
 95
 GOODWIN, Circuit Judge, Dissenting in part, Concurring in part:
 
 
 96
 While I concur in much of the carefully researched and reasoned majority opinion, I cannot join in its ultimate conclusions. Moreover, because the terms of the Supplementary Treaty, Article 3(b), preclude review of this decision by the United States Supreme Court, I find it especially necessary to voice my concerns.
 
 
 97
 First, I believe the able trial judge correctly applied the Supplementary Treaty to Brennan's case. When one is caught carrying a primed bomb of devastating power, ready to detonate at the carrier's pleasure, it is not reasonable to characterize the offense as merely an "intent crime." Carrying such a bomb in such circumstances is criminal conduct, involving the use of a bomb. Such an offense has been removed by the Supplementary Treaty from the "political offense" exception, the perceived abuse of which underlay the negotiation of that remedial treaty.
 
 
 98
 With reference to Artt and Kirby, I believe that the majority reaches well beyond our limited power to review extradition requests under Article 3(b). The majority concludes that generalized evidence of systemic bias within Northern Ireland's justice system is admissible to demonstrate that a specific conviction was based on trumped-up charges. This conclusion is founded, apparently, upon the protected factors enumerated in the Supplementary Treaty, once a potential extraditee has established a prima facie case of significant procedural abuse. The district court found no such prima facie case, and I believe that the majority's holding on this account actually raises more questions than it answers, rendering application of the holding to this and future cases problematic at best.
 
 
 99
 First, the majority's holding does not indicate how to determine whether a prima facie case has been made out. Presumably, the potential extraditee must at the outset provide the judicial official with some evidence of bias directly related to his or her situation. Mere fact of the charge and conviction within the Diplock system, along with a protestation of innocence, would obviously not qualify. Nor does it makes sense that generalized evidence of bias could serve to demonstrate at once both the prima facie case as well as the trumped-up nature of the charges. But beyond that, the holding is unclear. The opinion fails to indicate the role of the protected factors in making out a prima facie case. More importantly though, the majority's requirement that the potential extraditee show "prima facie that significant procedural abuses occurred" does little to illuminate the standard by which judicial officials are to measure evidence presented in cases arising under this unique treaty.
 
 
 100
 That this is so is illustrated by the district judge's attempt here to grapple with the scope of the inquiry under Article 3(b). As Judge Legge recognized, "this court is not a supreme court of review over the courts of the United Kingdom. It has no power ... to reexamine respondents' convictions using ... American law or American procedure." In re Artt, 972 F.Supp. 1253, 1262 (N.D.Cal.1997). Judge Legge correctly identified the difficulty inherent in applying Article 3(b): clearly the Senate did not intend for American judges to employ American constitutional and statutory standards to determine the fairness or correctness of a conviction obtained in a foreign judicial system, yet the terms of the Supplementary Treaty provide precious little alternative guidance. Far from filling this void, however, the majority opinion compounds the difficulty by calling for an additional layer of inquiry (the determination of whether a prima facie case has been made out) without indicating the standard by which the district court should measure the substantiality of any alleged procedural abuse.
 
 
 101
 Second, the majority's justification for the admissibility of general evidence of systemic bias to show a conviction based on trumped-up charges--"[t]he United States Supreme Court has made it unmistakably clear that more generalized inquiries such as statistical analyses play an important role when the existence of discrimination is in dispute" (internal quotations and citation omitted)--severely overstates the Supreme Court's position. While the Court has approved of the use of statistical evidence in domestic litigation involving venire-selection and Title VII issues, it has done so not simply because the existence of institutional discrimination is in dispute. Rather, it is because "[i]n those cases, the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions." See McClesky v. Kemp, 481 U.S. 279, 295, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (footnotes omitted). In McCleskey, the Court rejected the use of generalized statistical evidence under other circumstances, to prove racial discrimination in the application of the death penalty. Id. at 294, 107 S.Ct. 1756. Thus, I believe that the majority's reliance on the admissibility of such evidence in Title VII and venire-selection cases,[1] to justify admissibility here, is misplaced.[2]
 
 
 102
 I believe that Artt and Kirby's extradition cases resemble a death penalty case, where generalized statistical evidence has been deemed inadmissible, more than they resemble venire-selection or Title VII cases. As the Court noted in McCleskey, in venire-selection cases, the factors to be considered are limited by statute, uniformly applied and for the most part objectively verifiable, while in employment discrimination cases, the variables, while numerous, are nonetheless uniform. Id. at 295 n. 14, 107 S.Ct. 1756. Thus, in those sorts of cases, "an unexplained statistical discrepancy can be said to indicate a consistent policy of the decisionmaker." Id. at 295 n. 15, 107 S.Ct. 1756. Meanwhile, in extradition cases implicating the trumped-up charges clause of Article 3(b), as with death penalty cases, there are many entities whose decisions contribute to the end result, be it a conviction based on allegedly trumped-up charges or the imposition of the death penalty in an allegedly discriminatory manner. See id. The decision to convict Artt and Kirby in the Diplock system, like a jury's decision to impose the death penalty, "rest[s] on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular ... offense ." Id. at 294, 107 S.Ct. 1756. Thus, "[i]t is incomparably more difficult to deduce a consistent policy by studying the decisions of these many unique entities," and as a result the relevance and weight of generalized evidence is considerably lessened. Id. at 295 n. 15, 107 S.Ct. 1756.
 
 
 103
 Finally, even if the district judge were somehow to find that Artt and Kirby have made out a prima facie case of substantial procedural abuse, I cannot see where generalized evidence of systemic bias could outweigh in this case the overwhelming particularized evidence of their guilt.
 
 
 104
 Thus, I would affirm the District Court in all respects, and to the extent that the majority has agreed that the 1977 Treaty and Supplementary Treaty are not unconstitutional, I concur, of course, in those portions of the majority opinion.
 
 
 
 [1]
 This clause was named after Ninoy Aquino, who was assassinated following his extradition from the United States to the Philippines. See 132 Cong. Rec. S9253 (daily ed. July 17, 1986)
 
 
 [2]
 Appellant Brennan concedes that he is guilty of the offense of which he was convicted and consequently limits his defense to the second clause of Article 3(a)
 
 
 [1]
 Turner v. Marshall, 63 F.3d 807 (9th Cir.1995), is more accurately characterized as a venire-selection case, than a case "in the criminal context." Id. at 813. Moreover, as discussed herein, use of generalized statistical evidence "in the criminal context," e.g., to demonstrate disparate sentencing, has actually been rejected by the Supreme Court
 
 
 [2]
 In addition, the majority fails adequately to emphasize the caveats attendant with use of statistical evidence. Although the opinion does allude generally to a "cautious approach," its selective quoting from our decision in Wards Cove results in, I think, an inaccurate depiction of our level of comfort with the admissibility of such evidence. The entire sentence from Wards Cove reads: "We have recognized the importance of statistics as circumstantial evidence of discriminatory intent, but have cautioned that the weight given to them depends on proper supportive facts and the absence of variables." Atonio v. Wards Cove Packing Co., Inc., 827 F.2d 439, 444 (9th Cir.1987), rev'd, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (internal quotation and citation omitted) (emphasis added). See also, International Bhd. of Teamsters v. United States, 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("[w]e caution ... that statistics ... come in infinite variety and ... their usefulness depends on all of the surrounding facts and circumstances")